# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDRY OMAR BLANCO BONILLA,**<br>**WILD YAHARE CHIRINOS ROMERO,**<br>and **JERCE EGBUNIK REYES**<br>**BARRIOS**, *on behalf of themselves and all*<br>*others similarly situated*,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>**CSI AVIATION, INC.,**<br>  3700 Rio Grande Blvd. NW<br>  Suite 1<br>  Albuquerque, NM 87107<br><br>     and<br><br>**GLOBAL CROSSING AIRLINES**<br>**GROUP INC.,**<br>  4200 NW 36th Street<br>  Building 5A<br>  Miami International Airport<br>  Miami, FL 33166<br><br>     and<br><br>**GLOBAL CROSSING AIRLINES, INC.**<br>**d/b/a GLOBALX,**<br>  4200 NW 36th Street<br>  Building 5A<br>  Miami International Airport<br>  Miami, FL 33166<br><br>      *Defendants*. | Case No. 1:26-cv-02511<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>1. Civil Rights Conspiracy (42 U.S.C. §§ 1985(2) and (3))<br>2. Failure to Prevent Civil Rights Conspiracy (42 U.S.C. § 1986)<br>3. Safe Conducts (28 U.S.C. § 1350)<br>4. False Imprisonment<br>5. Intentional Infliction of Emotional Distress<br>6. Negligence<br>7. Negligent Infliction of Emotional Distress |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

THE PARTIES.................................................................................................................... 5

    PLAINTIFFS ...............................................................................................................5

    DEFENDANTS .............................................................................................................7

JURISDICTION AND VENUE ......................................................................................... 9

FACTS .............................................................................................................................. 10

I.    The Scheme Between Defendants and the Administration to Render Venezuelan Migrants to CECOT. ........................................................................................................... 10

    A.  The Administration's Publicly Pronounced Animus Against Latin American, Especially Venezuelan, Immigrants.................................................................10

    B.  The United States and El Salvador Publicly Agree to Imprison Venezuelans at CECOT, a Brutal Salvadoran Mega-Prison. .............................................14

    C.  The Administration Falsely Labels Plaintiffs and Class Members as Criminal Gang Members. ...............................................................................................19

    D.  CSI and GlobalX Agree to the Scheme to Transport Plaintiffs and the Class to El Salvador for Imprisonment at CECOT. ...................................................22

    E.  Depriving Them of Due Process and Attempting to Bypass Judicial Review, the Administration and Defendants Rush to Remove Plaintiffs and Class Members from the United States. ....................................................................27

II.    CSI and GlobalX Transport Plaintiffs and Class Members to El Salvador Pursuant to the Rendition Scheme. ........................................................................................ 29

    A.  In the Face of Court Orders, Defendants Hurriedly Transported Plaintiffs and the Class to El Salvador for Imprisonment at CECOT.................................29

B.  Allowed Aboard, Salvadoran Officials Abuse Plaintiffs and Class Members on GlobalX Planes in Front of GlobalX Employees. ........................................................33

III.  The Rendition Succeeds. ................................................................................. 37

A.  Plaintiffs and the Class are Tortured, Humiliated, and Imprisoned *Incommunicado* at CECOT. ........................................................................................................37

B.  CSI and GlobalX Profit from Their Participation in the Rendition Scheme. ..............46

CLASS ALLEGATIONS .................................................................................................. 47

CAUSES OF ACTION .................................................................................................... 50

COUNT I – CIVIL RIGHTS CONSPIRACY 42 U.S.C. § 1985(2) ............................................. 50

COUNT II – CIVIL RIGHTS CONSPIRACY 42 U.S.C. § 1985(3) ............................................ 52

COUNT III – FAILURE TO PREVENT CIVIL RIGHTS CONSPIRACY
    42 U.S.C. § 1986 ................................................................................................. 54

COUNT IV – SAFE CONDUCTS ALIEN TORT STATUTE,
    28 U.S.C. § 1350 ................................................................................................. 55

COUNT V – FALSE IMPRISONMENT .................................................................................. 56

COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ......................................... 57

COUNT VII – NEGLIGENCE ............................................................................................ 58

COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .......................................... 59

PRAYER FOR RELIEF .................................................................................................... 60



*1- Photograph of GlobalX rendition flight disembarking Class Members in El Salvador[1]*

## **INTRODUCTION**

1.        In March 2025, Defendants—CSI Aviation, Inc. ("CSI"), Global Crossing Airlines Group Inc., and its subsidiary, Global Crossing Airlines, Inc. (together, "GlobalX")—knowingly rendered over 230 Venezuelan migrants to confinement in inhumane conditions and torture in El Salavador, a country with which they had no connection. Despite knowing that El Salvador's Centro de Confinamiento del Terrorismo ("CECOT") mega-prison was a notorious blacksite, from which no detainee had ever left alive, Defendants went to great lengths to transport Plaintiffs and Class Members there, in concert with the U.S. government, in flagrant violation of U.S. and international law. At CECOT, Plaintiffs and Class Members were subjected to cruel, inhumane, and degrading treatment, physically and psychologically tortured, forced to survive in punitive conditions, and held *incommunicado* for over four months.

2.        Defendants and the Administration carried out this scheme in the face of ongoing

---

[1] Philip Holsinger, *What the Venezuelans Deported to El Salvador Experienced*, Time (Mar. 21, 2025), https://time.com/7269604/el-salvador-photos-venezuelan-detainees/.

1

judicial proceedings and court orders in this District, evading judicial review that would have prevented the scheme from being effectuated. Indeed, in the frenzied twenty-four hours preceding the flights' departures, Defendants rushed to provide transportation services essential to the scheme's success, even as proceedings before a court in this District seeking to halt the flights were unfolding, alongside widespread public reporting and scrutiny. But for Defendants' actions, the Administration's unlawful plot would not have succeeded.

3. Defendants undertook this rendition with the Administration to implement a well-publicized agreement between the Salvadoran and U.S. governments that U.S. Secretary of State Marco Rubio publicly lauded as "the most unprecedented, extraordinary, extraordinary migratory agreement anywhere in the world."[2] Under this publicly reported agreement, President Nayib Bukele of El Salvador agreed to imprison Plaintiffs and the Class at CECOT on behalf of the Administration, in exchange for millions of dollars. But what made this agreement so "unprecedented" and "extraordinary" was its abject cruelty.

4. Indeed, cruelty was the point: the Administration publicly sought to punish Plaintiffs and the Class, while also threatening other migrants in the United States and deterring would-be migrants, "by subjecting [these Venezuelan] deportees to maximum pain and suffering." Mem. Op. at 20, *J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C. Dec. 22, 2025), ECF No. 215 ("*JGG* Summ. J. Op."). Plaintiffs and the Class were sent to CECOT to demonstrate that migrants in the United States could be deported to countries with which they had no relationship and be subjected to treatment so horrific that it would not be possible on U.S. soil.

5. The rendition scheme arose out of the Administration's long-standing and well-

---

[2] *Rubio Says El Salvador Will House Deportees from U.S., Including Americans*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/04/g-s1-46352/rubio-el-salvador-deportees-americans.

documented animus against Latin American immigrants, particularly Venezuelans. Within days of assuming power, the new Administration moved to terminate the Temporary Protected Status ("TPS") of approximately 600,000 Venezuelans, determining that, "even assuming" the extraordinary and dangerous conditions in Venezuela were such that TPS beneficiaries could not return there safely, "it is contrary to the national interest to permit [them] to remain in the United States." Order at 15, *Nat'l TPS All. v. Noem*, No. 25-cv-01766 (N.D. Cal. Sep. 5, 2025), ECF No. 279 (citing Notice of Termination for Venezuela TPS, 90 Fed. Reg. at 9042). They had to go. The TPS termination came amidst months of the Administration publicly dehumanizing Venezuelan migrants, frivolously and categorically labeling them as criminals, gang members, and monsters.

6.     The use of CECOT was especially abhorrent. Since January 2023, the mega-prison had been the centerpiece of President Bukele's violent crackdown on alleged gang members in El Salvador. Notorious worldwide for its brutality, Salvadoran officials themselves publicly hailed CECOT as a place where detainees "will only be able to leave in a coffin."[3] In the days and weeks leading up to the rendition flights, CECOT became even more infamous as Presidents Bukele and Trump, as well as other U.S. officials, publicly telegraphed that the prison would be used to imprison Venezuelan migrants present in the United States.

7.     The Administration could not carry out this rendition scheme without a willing partner. Defendant CSI, who had a close relationship with the Administration, and its subcontractor, GlobalX, were on standby. In late February 2025, after news of the Administration's intent to hold migrants in CECOT was publicly known, Immigration and Customs Enforcement ("ICE") and CSI entered an unusual no-bid "surge" contract for air transportation services due to

---

[3] *"You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison*, Human Rights Watch (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el.

an "increased need and urgent timeline for support."[4] On Friday, March 14, 2025—the day the Administration signed, but did not publish, a Proclamation invoking the Alien Enemies Act of 1798 as authority to summarily remove Venezuelan migrants on the baseless accusation that they were members of the Tren de Aragua gang (the "Proclamation")—ICE and CSI agreed to modify that contract to "increase[] the number of aircrafts" that the contractors would provide.[5] That same day, in an unprecedented move, GlobalX, working at the behest of CSI, positioned *three* of its airplanes at the airport in Harlingen, Texas.

8.      The next day, on Saturday, March 15, 2025, Plaintiffs and the Class Members were ushered onto the three GlobalX planes in shackles, deceived into believing that they were being returned home to Venezuela, and confined on the tarmac for hours. Because of the unprecedented nature of the scheme and the efforts to stop it, news of the flights and the related proceedings in this District exploded into nationwide, front-page news. Defendants did not alter course. The planes were kept grounded until just after the Proclamation was announced, despite ongoing judicial proceedings, at which point each plane took off, one by one.

9.      As two of the planes headed toward their destination, and the third stood awaiting take-off, Chief Judge James E. Boasberg expressly prohibited the Administration from carrying out the removals pursuant to the Proclamation and issued written and verbal orders to turn the planes around. It made no difference. CSI and GlobalX hurriedly shuttled all three planes to El Salvador, anyways.

10.      Each plane landed in San Salvador, amongst a sea of armed Salvadoran security

---

[4] *Limited Source Justification for Chartered Flights*, Sam.gov (Feb. 27, 2025), https://sam.gov/opp/a532873313ff4de8848e913d152e658d/view.

[5] *Contract Award: 70CDCR25FR0000022*, Transaction History, USASpending.gov, https://perma.cc/56XW-K565.

forces and armored vehicles. GlobalX personnel nonetheless permitted Salvadoran forces to storm the planes and drag Plaintiffs and the other shackled Class Members from the aircrafts, bend and beat them, and force them violently into armored vehicles bound for CECOT.

11.     Confined at CECOT, Plaintiffs and Class Members were held *incommunicado* for over four months and physically and psychologically tortured. They endured systematic abuse, sexual assault, extreme heat, overcrowded cells, and ritualized violence and humiliation. All the while, the Administration publicized and celebrated their degradation as a means to advance its mass deportation policy, incite self-deportation, and threaten would-be migrants.

12.     While Defendants have enjoyed unprecedented financial profits from the scheme and their relationship with the Administration, Plaintiffs and the Class continue to experience severe emotional suffering from the humiliation, terror, and cruelty that they endured.

13.     Plaintiffs, individually and on behalf of all others similarly situated, as defined herein, bring this action against Defendants CSI and GlobalX—enablers of the "unprecedented, extraordinary" rendition scheme—who knew or should have known that rendering Plaintiffs and the Class to CECOT would result in their physical and psychological suffering. Plaintiffs and the Class seek compensatory and punitive damages for their rendition to CECOT, carried out by Defendants in clear violation of domestic and international law, including the prohibitions against *refoulement*, torture, and cruel, inhuman, or degrading treatment.

## THE PARTIES

### PLAINTIFFS

14.     Plaintiff and Class Representative Andry Omar Blanco Bonilla, a native of Venezuela, was forcibly rendered to CECOT on March 15 or 16, 2025, by or with the substantial and knowing assistance of Defendants, co-conspirators with the Administration. Mr. Blanco Bonilla is 41 years old, a father to seven children, and was educated as an industrial engineer. He

entered the United States in December 2023 through the Eagle Pass Port of Entry in Eagle Pass, Texas, and requested asylum. Mr. Blanco Bonilla has never been charged or convicted of any crime in the United States, El Salvador, or any other country. He has never been part of the Tren de Aragua gang and has no past or present connection or affiliation with Tren de Aragua or any other gang in any country. Nonetheless, while Mr. Blanco Bonilla was actively participating in ICE check-ins after release from ICE detention and awaiting his flight home to Venezuela—set for April 2, 2025—he was suddenly re-detained, shipped around the country, and then ultimately rendered to CECOT pursuant to the scheme carried out by Defendants and the Administration. At CECOT, Mr. Blanco Bonilla was confined *incommunicado* for over four months, physically and psychologically tortured, and systematically humiliated. He continues to experience severe emotional distress and suffering.

15.    Plaintiff and Class Representative Wild Yahare Chirinos Romero, a native of Venezuela, was forcibly rendered to CECOT on March 15 or 16, 2025, by or with the substantial and knowing assistance of Defendants, co-conspirators with the Administration. Mr. Chirinos Romero is 30 years old and a professional tattoo artist and barber. He entered the United States in January 2025 for his scheduled appointment with U.S. officials in accordance with the CBP One application process for admission to the United States and requested asylum. U.S. officials immediately detained him and interviewed him while in detention. Mr. Chirinos Romero has never been charged or convicted of any crime in the United States, El Salvador, or any other country. He has never been part of the Tren de Aragua gang and has no past or present connection or affiliation with Tren de Aragua or any other gang in any country. Although Mr. Chirinos Romero passed his first interview and was awaiting a subsequent hearing on March 19, 2025—one that U.S. officials scheduled for him after his first interview—he was never released from detention and was

transported to CECOT pursuant to the scheme carried out by Defendants and the Administration. At CECOT, Mr. Chirinos Romero was confined *incommunicado* for over four months, physically and psychologically tortured, and systematically humiliated. He continues to experience daily headaches, difficulty sleeping, as well as severe emotional distress and suffering.

16.     Plaintiff and Class Representative Jerce Egbunik Reyes Barrios, a native of Venezuela, was forcibly rendered to CECOT on March 15 or 16, 2025, by or with the substantial and knowing assistance of Defendants, co-conspirators with the Administration. Mr. Reyes Barrios is 37 years old, a father of two daughters, and a professional soccer player and youth soccer coach. He entered the United States in September of 2024 through the San Ysidro Port of Entry in San Ysidro, California for his scheduled appointment with U.S. officials in accordance with the CBP One application process and requested asylum. U.S. officials immediately detained him and interviewed him while in detention. Mr. Reyes Barrios has never been charged or convicted of any crime in the United States, El Salvador, or any other country. He has never been part of the Tren de Aragua gang and has no past or present connection or affiliation with Tren de Aragua or any other gang in any country. Although Mr. Reyes Barrios was working with counsel to apply for asylum and had pursued available legal processes, he was never released from detention and was transported to CECOT pursuant to the scheme carried out by Defendants and the Administration. At CECOT, Mr. Reyes Barrios was confined *incommunicado* for over four months, physically and psychologically tortured, and systematically humiliated. He continues to experience headaches, difficulty sleeping, as well as severe emotional distress and suffering.

**DEFENDANTS**

17.     Defendant CSI Aviation, Inc., is an aviation services company that provides and brokers air charter services as a prime contractor for ICE. CSI is incorporated in Texas, with its principal place of business in Albuquerque, New Mexico. After its 2024 five-year prime contract

7

award with ICE was held up in administrative challenges, CSI was awarded an interim ICE contract, without a competitive bidding process, to "provide . . . charter flights to facilitate ICE's Enforcement and Removal Operations of illegal aliens."[6]

18.    CSI, as the primary contractor, is responsible for the performance of its partners and subcontractors.[7] At all relevant times, GlobalX acted as an agent for CSI. GlobalX's ICE charter work flowed through, and existed only by virtue of, CSI's prime contract with ICE. CSI controlled the manner and means by which GlobalX performed its work under CSI's ICE contracts; served as the intermediary between ICE and GlobalX; and closely directed, supervised, monitored, and disciplined GlobalX's performance, personnel, and operations, including through real-time communications and reporting on events that occurred onboard. ICE communicated its requirements—flight taskings, schedules, manifests, and mission details—to CSI, and CSI in turn determined and directed how GlobalX would carry out those requirements. CSI is thus responsible for GlobalX's acts and omissions in the performance of its work, including GlobalX's role in carrying out the March 15 and 16, 2025 rendition flights.

19.    Defendant Global Crossing Airlines Group Inc. is an aviation services company that provides air charter services, including the provision of aircraft, crew, maintenance and insurance, directly and/or through its subsidiaries.

20.    Defendant Global Crossing Airlines, Inc. is a wholly-owned subsidiary of Defendant Global Crossing Airlines Group Inc. It is certified by the Federal Aviation Administration ("FAA") as a Part 121 scheduled air carrier.

---

[6] *Id.*

[7] *Attachment B: Statement of Work*, BPA#70CDCR24A00000001, U.S. Dep't of Homeland Sec. § 2.2 at 7 (Feb. 27, 2024) ("Feb 2024 SOW"), https://www.dhs.gov/sites/default/files/2025-05/25_0423_cpo_ICE-Contract-70CDCR24A00000001-Charter-Flight-BPA.pdf.

21.    Defendants Global Crossing Airlines Group Inc. and Global Crossing Airlines, Inc. (together, "GlobalX") are headquartered in Miami, Florida and incorporated in Delaware. Through the parent company, subsidiary, or both, GlobalX served as a subcontractor for CSI. In this role, it provided the aircrafts, pilots, flight crew, and essential flight services for the renditions to CECOT.

**JURISDICTION AND VENUE**

22.    This Court has federal question jurisdiction under 28 U.S.C. § 1331, jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, and supplemental jurisdiction over common law claims under 28 U.S.C. § 1367.

23.    This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), as the amount in controversy exceeds $5 million, the Class includes citizens of foreign states, and CSI and GlobalX are incorporated in Texas and Delaware, respectively.

24.    Defendants are subject to personal jurisdiction in this District because Defendants conspired with the Administration to render Plaintiffs and the Class to CECOT, including through a rendition scheme, the Proclamation, and an agreement with El Salvador hatched in this District. Defendants further conspired with the Administration to carry out the scheme despite judicial proceedings in this District, based on directives from the Department of Homeland Security and the Department of Justice issued from this District. Defendants also conspired with the Administration in the award of an interim contract to Defendants for the rendition flights, which was part and parcel of the conspiracy, in this District.

25.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this District, including the scheme to forcibly render Plaintiffs and the Class to CECOT and the judicial proceedings prohibiting that rendition.

9

## FACTS

**I.     The Scheme Between Defendants and the Administration to Render Venezuelan Migrants to CECOT.**

26.     Through three flights that took off from Texas on the evening of March 15, 2025, CSI and GlobalX rendered Plaintiffs and the Class to El Salvador, where they were imprisoned, tortured, and held *incommunicado* in inhumane conditions for over four months. The rendition scheme was a product of the Administration's longstanding animus against Latin American and Venezuelan migrants, which consisted of branding them, without evidence, as criminal gang members. Defendants acted as willing collaborators, for substantial profit—surreptitiously and hurriedly transporting Plaintiffs and the Class in a manner that allowed the Administration to outrun judicial scrutiny of plainly unlawful conduct. Defendants engaged in this scheme despite knowing or recklessly disregarding the fact that Plaintiffs and the Class would be tortured. Without their complicity, neither Plaintiffs nor the Class would have been rendered to CECOT.

**A.     The Administration's Publicly Pronounced Animus Against Latin American, Especially Venezuelan, Immigrants.**

27.     Days before the 2024 presidential election, now-President Trump took the stage at an aircraft hangar in Albuquerque, New Mexico—owned, operated, and hosted by friend of the Administration, Defendant CSI—and delivered one of his final campaign-trail immigration speeches, underscoring his promise of ending the "migrant invasion." Consistent with systematic messaging on the campaign trail and into his presidency,[8] the President dehumanized Latino

---

[8] *See, e.g.*, Mark Follman, *Trump Amplifies His Dangerous Hate Speech Against Migrants*, Mother Jones (Sep. 30, 2024), https://www.motherjones.com/politics/2024/09/trump-hate-speech-migrants-campaign-rallies-incitement/ (President Trump: "I will liberate [the state] from this mass migrant invasion of murderers, rapists, hoodlums, drug dealers, thugs, and vicious gang members. I will liberate our nation."); Ginger Gibson, *Trump Says Immigrants are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://www.nbcnews.com/politics/2024-election/trump-says-immigrants-are-poisoning-blood-country-biden-campaign-liken-rcna130141 (President Trump: "They let — I think the real number

immigrants—calling them "killers," "drug addicts," "vicious gang members," and "bloodthirsty criminals."[9] "People are being killed every single day by illegal migrants coming into this country," he warned, including by "savages" from Venezuela.[10]

28.    Latino immigrants, and especially Venezuelans, were a particular target of the Administration's animus. The President frequently claimed that Americans were "living in fear," because migrants to the United States came out of "the slums and prison cells of Caracas [Venezuela]."[11] "[W]e have to live with these animals, but we're not going to live with them for long, you watch."[12] He repeatedly argued that Venezuela "dumped hundreds of thousands of people into our country from prisons,"[13] and took all of their "criminals" and "gang members" and

is 15, 16 million people into our country. When they do that, we got a lot of work to do. They're poisoning the blood of our country. That's what they've done."); Marisa Iati, *Trump Says Some Undocumented Immigrants Are "Not People"*, Wash. Post (Mar. 16, 2024), https://www.washingtonpost.com/politics/2024/03/16/trump-immigrants-not-people/ (President Trump: "I don't know if you call them people . . . "[i]n some cases they're not people, in my opinion."); Bente Birkeland, *Trump Rallies in Aurora — A City He Has Demonized as Overrun by Migrant Crime*, NPR (Oct. 11, 2024), https://www.npr.org/2024/10/11/nx-s1-5147400/donald-trump-aurora-colorado-rally (President Trump: "Kamala [Harris] has imported an army of illegal alien gang members and migrant criminals from the dungeons of the third world. And she has had them resettled, beautifully, into your community to prey upon innocent American citizens . . . ."); *Former President Trump Holds News Conference at New Jersey Golf Club*, at 29:11, C-Span (Aug. 15, 2024), https://www.c-span.org/program/campaign-2024/former-president-trump-holds-news-conference-at-new-jersey-golf-club/647646 (President Trump: "She [Kamala Harris] wants to end [*sic*] detention of illegal alien migrants, releasing vicious monsters into our communities to rape, maim, and murder our population.").

[9] *Transcript of Speech: Donald Trump Holds a Campaign Rally in Albuquerque, New Mexico- October 31, 2024*, Roll Call (Oct. 31, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-albuquerque-new-mexico-october-31-2024/.

[10] *Id.*

[11] *Transcript of Speech: Donald Trump Holds a Campaign Rally in Aurora, Colorado - October 11, 2024*, Roll Call (Oct. 11, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-aurora-colorado-october-11-2024/.

[12] *Id.*

[13] Angélica Franganillo Díaz, *Trump Blames Maduro for Migrants, But A War in Venezuela Could Create Millions of Refugees*, CNN (Dec. 7, 2025), https://www.cnn.com/2025/12/07/politics/venezuela-war-migrants-trump.

"dropp[ed] them all into our country."[14]

29.    Indeed, while a candidate, the President called Venezuelan migrants "criminals" seventy times on the campaign trail, between September 1, 2023 and October 2, 2024.[15]

30.    Speaking from CSI's hangar, the President further promised to invoke the Alien Enemies Act of 1798 if elected, "to expedite removal of the Tren de Aragua and other savage gangs."[16] He called the mission "Operation Aurora," expressly linking the Administration's promises to his prior inflammatory claims that the Denver suburb, Aurora, has been taken over by Tren de Aragua gang members.

31.    Publicly demonizing an entire population of Venezuelan immigrants in such a manner was necessary stage-setting for the Administration to exact maximum cruelty and retribution. This rhetoric was designed to cast Venezuelan immigrants as deserving of the degradation, brutality, and humiliation the Administration would ultimately inflict on Plaintiffs and the Class.

32.    Other high-level Administration officials echoed and amplified this demonizing message, including Kristi Noem—who later became Secretary of Homeland Security and oversaw ICE and its contractors. Throughout 2024, she claimed that "Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of

---

[14] The American Presidency Project, *Remarks at Campaign Rally at the National Guard Association Conference in Detroit, Michigan*, UC Santa Barbara (Aug. 26, 2024), https://www.presidency.ucsb.edu/documents/remarks-campaign-rally-the-national-guard-association-conference-detroit-michigan.

[15] Russell Contreras et al., *Trump Keeps Calling Venezuelan and Congolese Migrants Criminals*, Axios (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[16] *Oct. 31, 2024 Tr.*, *supra* note 9; *see also Oct. 14, 2024 Tr.*, *supra* note 12.

America."[17] She demanded that deportations of Venezuelans "start on DAY ONE of [President Trump's] term."[18] Days after the new Administration entered office, Secretary Noem proclaimed that "[t]he people of this country want these [Venezuelan] dirtbags out."[19]

33.    The Administration's rhetoric was accompanied by other concrete measures directed at Venezuelans, including, starting in the earliest days of the Administration, the revocation of TPS for hundreds of thousands of Venezuelan nationals living and working in the United States. In enjoining the revocation, a district court found "evidence of discriminatory animus" by the Administration, which it determined "bore a direct nexus to" the decision to revoke TPS. *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 858 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1000 (9th Cir. 2025). The court catalogued how Secretary Noem played on "longstanding tropes or stereotypes that certain races have inherently immoral traits," for which there is "no evidence." *Id.* at 859. The court further labeled this treatment of Venezuelans as a "classic form of racism." *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1157 (N.D. Cal. 2025). The Ninth Circuit agreed, with one Circuit Judge noting the "extraordinary statements by direct decision-makers . . . evince a hostility toward, and desire to rid the country of, TPS holders who are Venezuelan." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 775 (9th Cir. 2026) (Mendoza, J., concurring in part). This animus, not the pretextual "official concerns" raised by the Administration, was the "driving force[]" that motivated the TPS revocation. *Id.* at 780.

34.    The Administration's widely-publicized scorn and reprobation of Venezuelan

---

[17] NBC News, *Meet the Press Full Broadcast — Feb. 2*, at 16:23, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco&t=997s.

[18] Kristi Noem (@KristiNoem), X (Feb. 27, 2024, at 7:26 CT), https://x.com/KristiNoem/status/1762650522920652828.

[19] Fox & Friends (@foxandfriends), Instagram (Jan. 29, 2025), https://www.instagram.com/reel/DFaf8JTxU-o/.

migrants illustrates the motivation for the Administration's scheme to strip Plaintiffs and Class Members of due process and render them to a brutal mega-prison where they would foreseeably be tortured. The goal was to overtly dehumanize Plaintiffs and Class Members and instill terror in current and future migrants in a way that could not be done if Plaintiffs and Class Members were detained on U.S. soil.

**B.      The United States and El Salvador Publicly Agree to Imprison Venezuelans at CECOT, a Brutal Salvadoran Mega-Prison.**

35.      Acting pursuant to its publicly expressed animus, the U.S. government sought to subject Venezuelan migrants in the United States to treatment that would punish and make an example of them. To do so, it needed a place they believed was beyond the reach of U.S. courts: a site from which Plaintiffs and Class Members could not return, where they could be imprisoned under the worst conditions without regard to constitutional protections or meaningful judicial oversight. El Salvador, under the presidency of Nayib Bukele, offered precisely that.

36.      On January 31, 2025, it was well publicized that Secretary Rubio met with President Bukele to discuss sending purported gang members, specifically the Venezuelan Tren de Aragua gang, to be imprisoned in El Salvador.[20] Secretary Rubio's public comments demonstrated that the appeal of the arrangement with El Salvador was the dangerous and cruel conditions of confinement to which deportees would be subjected: "We're looking to do a new agreement that might include the members of the Tren de Aragua, who will want to go back to Venezuela rather than having to share the prison with the Salvadorean gangs like MS-13. It's part of what we want to discuss and

---

[20] *See, e.g.*, *On-the-Record Briefing on Secretary of State Marco Rubio's First Trip to the Western Hemisphere*, U.S. Dep't. of State (Jan. 31, 2025), https://www.state.gov/on-the-record-briefing-on-secretary-of-state-marco-rubios-first-trip-to-the-western-hemisphere/; Stefano Pozzebon et al., *El Salvador Offers to House Violent US Criminals and Deportees of Any Nationality in Unprecedented Deal*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/03/americas/el-salvador-migrant-deal-marco-rubio-intl-hnk.

how President Bukele can help us."[21]

37.     On February 3, 2025, after his meeting with Bukele, Rubio formally announced, through official channels, the deal with El Salvador, stating that Bukele had "agreed to the most unprecedented, extraordinary, extraordinary migratory agreement anywhere in the world."[22]

38.     Rubio explained: "Any unlawful immigrant, illegal immigrant in the United States who's a dangerous criminal—MS-13, Tren de Aragua, whatever it may be—he has offered his jails so we can send them [t]here and he will put them in his jails."[23]

39.     The next day, in a widely covered post written in English, President Bukele confirmed the agreement and publicly specified that "his jails" meant the Salvadoran mega-prison CECOT. As was well reported, President Bukele "offered the United States of America the opportunity to outsource part of its prison system."[24] "We are willing to take in only convicted criminals . . . into our mega-prison (CECOT) in exchange for a fee."[25]

40.     The decision to specifically use CECOT was remarkable. Since its opening in

---

[21] Jennifer Hansler et al., *Rubio Heads to Central America as Trump Admin Attempts Crackdown on Migration to US*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/02/01/politics/rubio-central-america-trip-migration.

[22] *Supra* note 2; *see also Secretary Rubio's Meeting with Salvadoran President Nayib Bukele*, U.S. Dep't of State (Feb. 3, 2025), https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/; *Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation*, U.S. Dep't of State (Feb. 3, 2025), https://perma.cc/G97U-ZHBE.

[23] *CECOT: Inside the Mega-Prison El Salvador Has Offered Up for Trump's Use*, Newsweek (Feb. 4, 2025, updated Apr. 8, 2025), https://www.newsweek.com/cecot-el-salvador-prison-marco-rubio-trump-bukele-2026011.

[24] Nayib Bukele (@nayibbukele), X (Feb. 4, 2025), https://x.com/nayibbukele/status/1886606794614587573; *see also* Annie Correal, *El Salvador's President Offers to Accept Criminals from U.S. for a Fee*, N.Y. Times (Feb. 4, 2025), https://www.nytimes.com/2025/02/04/us/politics/el-salvador-prisons-marco-rubio.html; Vanessa Buschschlüter & Nathan Williams, *El Salvador Offers to Lock Up US Criminals in Its Mega-Jail*, BBC (Feb. 4, 2025), https://www.bbc.com/news/articles/c0jn5291p52o.

[25] Buschschlüter, *supra* note 24.

January 2023, CECOT had become a "notorious supermax prison known for widespread human rights violations," with "some of the most inhuman and squalid conditions known in any carceral system." Mem. Op. at 5, *Garcia v. Noem*, No. 25-cv-00951 (D. Md. Apr. 6, 2025), ECF No. 31. Human rights organizations and international observers had consistently documented systematic abuse, including extreme overcrowding, prolonged *incommunicado* detention, and denial of medical care.[26]

41.     Indeed, CECOT was at the center of President Bukele's violent, and much criticized, crackdown against alleged gang members—a crackdown so sweeping and indiscriminate that it has ensnared innumerable Salvadorans, including minors, with "no apparent connection to gangs' abusive activity."[27] Nevertheless, the Salvadoran government celebrated CECOT as a place to hold "terrorist gang members captured by law enforcement" and has described it as a facility for "permanent confinement."[28]

42.     Salvadoran officials said so themselves: "As the Security Cabinet, we will make sure that the sentences are high enough so that none of those who enter CECOT ever walk out; they will only be able to leave in a coffin."[29]

43.     The head of the prison system likewise bragged that "[a]ll terrorists entering CECOT will never come out, and those sent to punishment cells will not see the light of day."[30]

---

[26] *"You Have Arrived in Hell," supra* note 3; *"Your Child Does Not Exist Here": Human Rights Abuses Against Children Under El Salvador's "State of Emergency,"* Human Rights Watch (July 16, 2024), https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el.

[27] *"Your Child Does Not Exist Here," supra* note 26; *see also* Tirana Hassan, *El Salvador: Events of 2024*, Human Rights Watch, https://www.hrw.org/world-report/2025/country-chapters/el-salvador.

[28] *"You Have Arrived in Hell," supra* note 3.

[29] *Id.*

[30] *Id.*

44.    These statements were widely reported and formed part of the international criticism of President Bukele's mass-incarceration policies.

45.    Human Rights Watch concluded that CECOT "appears to have been built to violate the dignity and rights of people held there."[31] A former member of the United Nations Subcommittee for the Prevention of Torture described it as a "concrete and steel pit," used "to dispose of people without formally applying the death penalty."[32]

46.    Despite, or perhaps because of, the obvious and foreseeable risk of severe harm to the Venezuelans condemned to be imprisoned there, the U.S. government sought out—and then publicly celebrated from early February throughout March 2025—an agreement with El Salvador to confine Venezuelan migrants at CECOT. [33]

47.    On March 14, 2025, in a televised speech at the Department of Justice, President Trump again branded Plaintiffs and Class Members as gang members and foreshadowed the cruel treatment they would soon receive: "We've caught hundreds of them, the Venezuelan gang, which is as bad as it gets. . . . And you'll be reading a lot of stories tomorrow about what we've done with them and you'll be very impressed."[34]

---

[31] *Id.*

[32] Leire Ventas, *Coming Face to Face with Inmates in El Salvador's Mega-Jail*, BBC (Feb. 14, 2024), https://www.bbc.com/news/world-latin-america-68244963.

[33] *See, e.g.*, *CECOT: Inside the Mega-Prison*, *supra* note 23; Simon Lewis, *El Salvador Offers to House Criminals Deported from the US in Its Jails*, Reuters (Feb. 3, 2025), https://www.reuters.com/world/americas/rubio-meet-el-salvadors-bukele-amid-migration-push-2025-02-03/; *El Salvador Offers to House Criminals Deported from the US in Its Jails*, U.S. News (Feb. 3, 2025), https://www.usnews.com/news/world/articles/2025-02-03/rubio-to-meet-el-salvadors-bukele-amid-migration-push; Pozzebon, *supra* note 20; Correal, *supra* note 24; Buschschlüter, *supra* note 25.

[34] Zolan Kanno-Youngs et al., *Behind Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*, N.Y. Times (Apr. 30, 2025), https://www.nytimes.com/2025/04/30/us/politics/trump-deportations-venezuela-el-salvador.html?unlocked_article_code=1.Dk8.QIW8.0UDfofFRJIhR&smid=url-share.

48.     The very next day, March 15, 2025, the day of the rendition flights, it was leaked to the press—and then exploded as front-page news—that the U.S. government intended to purchase El Salvador's confinement and torture services for the sum of $6 million. Reporting revealed that the United States intended to pay El Salvador to accept and imprison approximately 300 Venezuelan migrants, alleged Tren de Aragua members, at CECOT for one year, pending the United States' decision on their long-term disposition.[35]

49.     The agreement between the United States and El Salvador, effectuated through the essential flight services provided by Defendants, "set in motion a *foreseeable* cascade of events," "prompt[ing] the engines of our government to corral individuals and ship them for detention in El Salvador in exchange for cash." Mem. Op. at 27, 32, *RFK Human Rights v. Dep't of State*, No. 25-cv-01774 (D.D.C. Mar. 25, 2026), ECF No. 49 (emphasis added).

---

[35] *See, e.g.*, Matthew Lee & Regina Garcia Cano, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, AP News (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7; *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, Chi. Tribune (Mar. 15, 2025 at 11:12 a.m. CDT), https://www.chicagotribune.com/2025/03/15/el-salvador-deportation/; Matthew Lee & Regina Garcia Cano, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, Yahoo! News (Mar. 15, 2025 at 12:05 p.m. EDT), https://perma.cc/22WF-9JXN; Matthew Lee & Regina Garcia Cano, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, Seattle Times (Mar. 15, 2025 at 9:06 a.m. PDT), https://www.seattletimes.com/nation-world/nation/us-prepares-to-deport-about-300-alleged-gang-members-to-el-salvador/; Josh Christenson, *El Salvador to Imprison 300 Tren de Aragua Gang Members Deported from US: Memo*, N.Y. Post (Mar. 15, 2025 at 1:48 p.m. ET), https://nypost.com/2025/03/15/us-news/el-salvador-to-imprison-300-tren-de-aragua-gang-members-deported-from-us-memo/; Associated Press, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, Newsday (Mar. 15, 2025), https://www.newsday.com/news/nation/trump-deportations-salvador-tren-aragua-w28646; Associated Press, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, US News (Mar. 15, 2025 at 12:05 p.m.), https://www.usnews.com/news/us/articles/2025-03-15/us-prepares-to-deport-about-300-alleged-gang-members-to-el-salvador; Associated Press, *US Plans to Deport About 300 Alleged Venezuelan Gang Members to El Salvador*, NBC4 Wash. (Mar. 15, 2025), https://www.nbcwashington.com/news/national-international/us-plans-to-deport-about-300-alleged-venezuelan-gang-members-to-el-salvador/3868881/.

**C.**    **The Administration Falsely Labels Plaintiffs and Class Members as Criminal Gang Members.**

50.    The Administration primed the pump for the scheme to transport Plaintiffs and the Class to CECOT. Invoking the Alien Enemies Act as the alleged authority to remove Venezuelans, the Administration repeatedly made the fantastically broad and unfounded assertion that "folks from Venezuela that have come into this country are members of [Tren de Aragua],"[36] a purported criminal organization that originated in Venezuela. The Administration used these baseless gang allegations as a pretext, not only to remove Plaintiffs and Class Members to CECOT where they would be subjected to torture and made into an example, but also to create fear and deter future migration "by subjecting [Venezuelan] deportees to maximum pain and suffering." *JGG* Summ. J. Op. at 20.

51.    The Administration's efforts to demonize and terrorize Venezuelan migrants aimed to legitimatize the Administration's cruel, extra-legal deal with El Salvador.

52.    In reality, the government has offered no evidence that ordinary Venezuelan asylum seekers like Plaintiffs and other Class Members are members of that gang or that the gang is invading or otherwise operating through any organized structure within the United States.

53.    Yet, without notice, any formal findings, or even the minimum threshold of due process, the Administration indiscriminately labeled Plaintiffs and the Class as Tren de Aragua gang members—relying wholly or in significant part on an unsupported connection between tattoos and gang membership.

54.    This method has been debunked by experts in criminology and gang culture who have said Tren de Aragua "has never had . . . identity marks such as tattoos that identify its

---

[36] *See, e.g.*, *Meet the Press Full Broadcast — Feb. 2*, *supra* note 17 at 16:23.

members." Decl. of Professor Andres Antillano at 6, *J.G.G.*, No. 25-cv-00766, ECF No. 67-4. "[N]o credible scholarship or studies of gangs in Venezuela indicate tattooing as a shared common practice among gang members," nor does Tren de Aragua membership have any reliable association with manner of dress or other iconography, such as symbols or logos. Decl. of Dr. Rebecca Hanson at 5, *J.G.G.*, No. 25-cv-00766, ECF No. 67-3 ("Tattoos are not a reliable way to identify members of the group. The TdA, and gangs more generally in Venezuela, do not have a history of using tattoos to indicate membership.").

55.    Indeed, Plaintiffs and many other Class Members labeled by the Administration as Tren de Aragua and their families have publicly and vehemently denounced the accusations that they have any past or present connection to Tren de Aragua, highlighting the spurious nature of the Administration's allegations.

56.    For example, the Administration's allegations of gang membership against Plaintiff Reyes Barrios—a professional soccer player—relied on his tattoo of a soccer ball topped with a crown, an homage to the crest of his favorite soccer team, Real Madrid. As a tattoo artist, Plaintiff Chirinos Romero's tattoos are both a form of artistic expression and an essential part of his job. And Plaintiff Blanco-Bonilla's tattoos symbolize what is important to him and include, among others, an image of him and his son embracing. None of Plaintiffs' tattoos have any association with Tren de Aragua.

57.    One Class Member—a make-up artist who fled Venezuela and was seeking asylum in the United States on account of his LGBTQ identity—was labeled a gang member due to "mom" and "dad" tattoos on his hands. Another asylum-seeker Class Member was accused based on an autism awareness tattoo—a rainbow-colored ribbon with the name of his autistic brother.

58.    Indeed, the jersey number 23, the Michael Jordan Jumpman logo, crowns, stars and

20

a phrase made popular by a reggaeton singer are among the many popular tattoos consigning men to a Tren de Aragua designation by the Administration.[37]

59.    As Judge Boasberg recognized, there is "significant evidence" that those hurriedly labeled as Tren de Aragua under the Alien Enemies Act "have no connection to the gang and thus languish[ed] in a foreign prison on flimsy, even frivolous, accusations." Mem. Op. at 4, *J.G.G.*, No. 25-cv-00766 (June 4, 2025), ECF No. 148 ("*JGG* Prelim. Inj. Op.").

60.    The Administration recklessly continued to link Plaintiffs and Class Members to Tren de Aragua and label them as "criminals," as though a criminal record would justify rendition to torture, and despite extensive reporting that Plaintiffs and the majority of the Class had no criminal convictions in the United States or anywhere in the world.[38] Indeed, "the government's own data . . . showed that officials knew that only 32 of the [Venezuelan deportees making up the Class] had been convicted of U.S. crimes and that most were nonviolent offenses, such as retail theft or traffic violations."[39]

61.    Only three percent of Venezuelan deportees rendered to CECOT had any violent or potentially violent charge or conviction in the United States of any kind. Nor has any Plaintiff or Class Member ever been charged or convicted of any crime in El Salvador, the country of confinement, either prior to or since their rendition there.

62.    And almost half of Class Members were in the middle of their immigration

---

[37] Nicole Acevedo et al., *Tattoos of Deported Venezuelans Don't Necessarily Signal Gang Affiliation, Experts Say*, NBC News (Mar. 21, 2025), https://www.nbcnews.com/news/latino/tattoos-deported-venezuelans-not-necessarily-gang-members-rcna197089.

[38] Mica Rosenberg et al., *Trump Administration Knew Most Venezuelans Deported from Texas to a Salvadoran Prison Had No U.S. Convictions*, The Tex. Tribune (May 30, 2025), https://www.texastribune.org/2025/05/30/trump-el-salvador-deportees-criminal-convictions-cecot-venezuela/.

[39] *Id.*

proceedings when they were rendered to CECOT, many in pursuit of asylum, which would have protected them from removal.

63.    Even President Bukele, after Plaintiffs and the Class arrived at CECOT, expressed doubts that they were actually "convicted criminals," as the Administration claimed and the agreement between the two countries contemplated.[40]

64.    Plaintiffs and the Class received no notice, no hearing, and no process whatsoever to challenge the Administration's unfounded accusations that they were criminals or gang members, let alone their rendition to CECOT on that basis. CSI and GlobalX, in concert with the Administration, instead "spirited away planeloads of people before any such challenge could be made." *JGG* Prelim. Inj. Op. at 4.

**D.    CSI and GlobalX Agree to the Scheme to Transport Plaintiffs and the Class to El Salvador for Imprisonment at CECOT.**

65.    The Administration's scheme to imprison Plaintiffs and Class Members in CECOT could not have succeeded without transport, including expeditious transport to evade judicial review. This transport was willingly provided by CSI and its subcontractor and agent, GlobalX. Defendants agreed to transport Venezuelan migrants to El Salvador on behalf of ICE, implementing the U.S.–El Salvador deal that exchanged cash for imprisonment, torture, and the spectacle of cruelty. Defendants provided the aircrafts, flight crews, and operational support necessary to the scheme, despite knowing or deliberately disregarding the risk that Plaintiffs and the Class would be subjected to physical and psychological torture.

66.    CSI was no stranger to the Administration. Allen Weh, CSI's CEO, and his family have made substantial contributions in support of President Trump's political ambitions, with

---

[40] Zolan Kanno-Youngs, *supra* note 34.

donations dating back to 2016, including over $840,000 to President-Trump-aligned political action committees, as well as $460,000 in direct donations to the 2024 campaign. In December 2020, during the final weeks of his first term, President Trump fired a number of the Pentagon's non-partisan Defense Business Board, replacing them with loyalists, including Mr. Weh.

67.    After the new Administration entered the White House, ICE, CSI, and GlobalX undertook a number of unusual actions, sparking a foreseeable cascade of events that culminated in the successful scheme to imprison Plaintiffs and Class Members in CECOT. At each juncture, CSI and GlobalX were knowing participants and took extraordinary steps to ensure the scheme's success.

68.    *First*, days after President Trump took office, ICE re-confirmed its prior grant of a five-year contract to CSI, despite agency-level challenges to CSI's award alleging that it was 500 million dollars over the competitor's quote. The grant was ultimately frozen in federal litigation.

69.    On February 27, 2025—less than a month after the Administration's "extraordinary migratory agreement" with El Salvador was announced—CSI and ICE entered into an interim no-bid "surge" contract for CSI to provide air transportation services in support of the Administration's mass deportation operations.

70.    Although government contracts are ordinarily awarded through a competitive bidding process, ICE stated that, based on the "increased need and *urgent timeline for support*," its "only solution" was to award this no-bid charter contract to CSI.[41]

71.    On March 14, 2025—the day President Trump secretly signed the Proclamation and delivered his televised speech at the Department of Justice, and the day before the rendition planes took off—CSI and ICE agreed to modify this no-bid contract to "increase[] the number of

---

[41] *Limited Source Justification for Chartered Flights*, *supra* note 4 (emphasis added).

aircraft […] further enhancing ICE's Enforcement and Removal Operations (ERO) Capability to Remove Illegal Aliens."[42]

72.     The no-bid award and its subsequent modification, both executed amid intense public debate over the plan to send migrants to CECOT and regular statements by U.S. officials telegraphing their intentions, were plainly aimed at implementing the U.S.–El Salvador agreement to render Venezuelan migrants to CECOT.

73.     *Second*, just like the hasty and unusual no-bid contracts and last-minute modification, the flight plans that CSI and GlobalX carried out to execute these renditions were themselves significant departures from standard operating procedures, designed specifically to facilitate the rendition scheme.

74.     In the preceding years, GlobalX had never operated more than one flight at a time from Harlingen. Yet, to carry out these renditions, GlobalX stationed *three* planes in Harlingen— and on a Saturday, also unprecedented. Indeed, ICE itself had never chartered such a significant number of individuals to El Salvador. The three-plane Harlingen operation was an extraordinary concentration of removals to that country.

---

[42] *Contract Award: 70CDcR25FR0000022*, *supra* note 5.



**Weekly Deportations of Third-country Nationals to El Salvador**

*2 - Data provided by ICE in response to FOIA[43]*

75. Military rendition flights are logistically difficult to coordinate and costly to operate, especially given that they can typically only carry a relatively small number of people at a time. But CSI and GlobalX's participation in the CECOT rendition scheme provided the Administration with immediate high-capacity transportation that the Administration otherwise would not have had, making Defendants unique and essential participants in the conspiratorial arrangement.

76. Further, Defendants necessarily knew they were transporting Plaintiffs and Class members to El Salvador, in furtherance of the scheme. Operationally, Defendants would have had to coordinate with ICE, days if not weeks before the flights departed to El Salvador.

77. As part of their contractual duties to ICE, Defendants were required to provide the U.S. government with a manifest of all staff on the plane at least 24 hours in advance, as Defendants were responsible for coordinating the flight crew. Indeed, flights operated by Defendants must be staffed by a pilot, flight attendants, security escorts, and a flight nurse, as well as ICE agents.

---

[43] *"You Have Arrived in Hell," supra* note 3.

78.     It is also required that "[p]rior to each flight, ICE will provide the contractor the names and identifying information of each foreign national and escort officer on the flight for inclusion in the flight plan."[44] CSI personnel in particular have "full access to ICE's data systems to input data and verify manifests on every mission." Decl. of Richard D. DeLucia at 5, *CSI Aviation, Inc., v. United States*, No. 25-cv-01338 (Fed. Cl. Jan. 9, 2026), ECF No. 37-1 ("DeLucia Decl."). In this case, Defendants bypassed normal required procedures to execute this scheme, failing to even accurately record the names of escort officers on the plane.

79.     Defendants were also required to obtain the proper clearances and coordinate with the receiving airport, here San Salvador in El Salvador, for purposes of air traffic control. Specifically, "[t]he contractor shall be responsible for obtaining all required clearances and landing permits relating to the aircraft, personnel, and subcontractors, to include passenger fees, overflight clearances, airport, and customs fees[.]"[45]

80.     Defendants were likewise responsible for "boarding and deboarding noncitizens . . . assisting with perimeter security, when requested, restraining noncitizens or removing restraints, and ensuring general security and safety of noncitizens when onboard the aircraft."[46] CSI specifically manages "pre-mission through post mission coordination with ICE, CBP, Detention Centers and Immigration paperwork verification for all . . . international removal missions" and maintains "inflight security, medical, communications, standard operating procedures, safety/quality oversight, and a robust flight management system to keep operations in order." DeLucia Decl. at 3–4. CSI's employees, many of whom are recent retirees from ICE and

---

[44] Feb 2024 SOW, *supra* note 7 at 22; *see also* 49 U.S.C. § 44909 (manifests requires "the full name of each passenger" and the "passport number of each passenger, if required for travel").

[45] Feb 2024 SOW, *supra* note 7 at 8.

[46] *Id.*

CBP, "are fully authorized to review and process deportation and removal activities." *Id.* at 4. CSI's systems also track "flights . . . and travel logistics in real time," *id.* at 5, including communications through the Aircraft Communications Addressing and Reporting System (ACARS), a text-based messaging system that allows aircrafts to communicate with ground systems for operational, logistical, and maintenance purposes.

81.     Defendants were thus necessarily aware that they were coordinating flights to carry scores of Venezuelans to El Salvador, at the very moment in history when the Administration was publicly celebrating its plan to imprison Venezuelan migrants at a mega-prison there.

82.     CSI and GlobalX had no lawful authority to render Plaintiffs and the Class to a third country where they would foreseeably be confined, punished, and subjected to extreme suffering. CSI and GlobalX were only tasked to "transport[] detained aliens ordered removed from the United States to their *countries of origin*," or "scheduled to countries or regions on an as-needed basis to *repatriate* aliens subject to final orders of removal to locations worldwide."[47]

83.     Armed with a no-bid interim contract they had conspired with the Administration to arrange, an expansion of aircraft capacity, and three planes staged on the Harlingen tarmac, CSI and GlobalX agreed to transport Plaintiffs and the Class to El Salvador—all in spite of extensive public reporting regarding the scheme and its inevitable outcome.

**E.     Depriving Them of Due Process and Attempting to Bypass Judicial Review, the Administration and Defendants Rush to Remove Plaintiffs and Class Members from the United States.**

84.     Before Plaintiffs and Class Members could exercise their due process rights to challenge the Administration's designation of them as gang members, or otherwise contest their

---

[47] U.S. Immigr. & Customs Enf't, *ICE Air Operations* (Aug. 8, 2023), https://www.ice.gov/factsheets/ice-air-operations?source=post_page (emphasis added).

hurried deportation to a torture prison, Defendants, in concert with the Administration, removed them from the United States and rendered them to CECOT—even as proceedings before Judge Boasberg to stop the removals were underway (hereinafter, "*JGG* proceedings").

85.     Indeed, the Administration's goal, with the agreement of and essential services from Defendants, was clearly to forcibly render Plaintiffs and the Class to CECOT, without opportunity for judicial review, in plain circumvention of the rule of law.

86.     Erez Reuveni—Acting Deputy Director for the Office of Immigration Litigation for the Department of Justice at the time of the renditions, who later became a government whistleblower—corroborated the deliberate circumvention of Judge Boasberg's orders.

87.     According to Mr. Reuveni, at a meeting on March 14, 2025—the day before the flights, and before the action before Judge Boasberg had even been filed—senior Department of Justice officials gathered to discuss the President's impending Proclamation and the removals it would set in motion.

88.     Anticipating that a court would enjoin those removals, Principal Assistant Deputy Attorney General, Emil Bove, stated that the planes "needed to take off no matter what" over the weekend, and that the Department may have to consider telling the courts "'f--- you'" and disregard any such order.[48] Then-Secretary Noem later admitted that it was her decision to continue the transfer, despite Judge Boasberg's orders to stop and return the flights.

89.     From the outset, the conspiracy was intended to prevent Plaintiffs and the Class from being able to invoke the protection of the federal courts or, if they did so, to prevent them from being able to meaningfully participate in those proceedings, as either parties or witnesses.

---

[48] Scott Pelley, *DOJ Whistleblower Says He Witnessed Government Officials Undermining the Rule of Law*, CBS News (Oct. 19, 2025), https://www.cbsnews.com/news/justice-department-whistleblower-says-he-witnessed-officials-undermining-rule-of-law-60-minutes-transcript/.

90.     As the details of the rendition make clear, the "hasty and secretive removal from the United States [to CECOT] was certainly intended to deprive [members of the Class] of an opportunity to secure prior judicial review." *JGG* Summ. J. Op. at 18. "[T]he Constitution flatly prohibits the Government from doing exactly what it did that Saturday, when it secretly loaded people onto planes, kept many of them in the dark about their destination, and raced to spirit them away before they could invoke their due-process rights." Mem. Op. at 14, *J.G.G.*, No. 25-cv-00766 (Apr. 16, 2025), ECF No. 81 ("*JGG* Contempt Op.").

## II.     CSI and GlobalX Transport Plaintiffs and Class Members to El Salvador Pursuant to the Rendition Scheme.

### A.     In the Face of Court Orders, Defendants Hurriedly Transported Plaintiffs and the Class to El Salvador for Imprisonment at CECOT.

91.     The chronology of events surrounding the March 15 and 16 rendition flights underscores the unprecedented and highly unusual steps that CSI and GlobalX took to ensure the successful transport of Plaintiffs and the Class to El Salvador for imprisonment at CECOT. Defendants prepared and carried out the flights to El Salvador amidst ongoing legal proceedings concerning the legality of the removals—acting in concert with the Administration to stay one step ahead of the judicial process, prepare the flights, and conceal what was truly occurring, both from the public and from Plaintiffs and the Class.

92.     Days and weeks prior to the rendition scheme, Plaintiffs and many other Class Members were interrogated about their affiliation with Tren de Aragua and their tattoos, shuttled all over the country, and then shipped to a Texas detention center. Plaintiffs—like many Class Members—adamantly refused any association with Tren de Aragua, past or present.

93.     Then, a few days prior to the renditions, CSI and GlobalX put three large charter planes in position to conduct the scheme. On Thursday, March 13, 2025, at 7:50 p.m. ET, the day before the Proclamation was signed, the first GlobalX plane, Flight No. 6143, arrived on the tarmac

at Harlingen, Texas. It was joined just minutes later by the second GlobalX plane, Flight No. 6145, which landed at 8:00 p.m. ET. And on Friday, March 14, 2025—the same day as the unusual and urgent no-bid "surge" contract modification to "increase[] the number of aircraft" and the signing of the Proclamation—the third and final GlobalX plane, Flight No. 6122, landed at Harlingen at 6:40 a.m. ET. Defendants had never previously stationed this many planes at Harlingen.

94.    Catching wind that removals under the Proclamation were about to begin imminently, a putative class of Venezuelans filed an emergency motion, initiating the *JGG* proceedings in this District, at 1 a.m. ET on March 15, 2025.

95.    In the early morning hours on March 15, 2025, Plaintiffs and the Class were nonetheless awakened from their cells, told they were being sent home to Venezuela, and then shackled, bused, and loaded onto the GlobalX planes sitting on the tarmac in Harlingen.

96.    At 9:40 a.m. ET, Judge Boasberg entered an *ex parte* temporary restraining order preventing the government from removing the five named plaintiffs in the *JGG* proceedings for fourteen days. *JGG* Contempt Op. at 5; Minute Order, *J.G.G.*, No. 25-cv-00766 (Mar. 15, 2025 at 9:40 a.m. ET).

97.    After that order, several of those named plaintiffs were abruptly removed from the GlobalX planes—evidence that the U.S. government and Defendants were "able, if they wished, to ensure that people on the ground knew relatively quickly of developments in the Court proceedings." *JGG* Contempt Op. at 5 (citations omitted).

98.    Just after 11:00 a.m. ET, Judge Boasberg set an emergency, publicly-accessible, hearing for 5:00 p.m. ET that same afternoon to consider whether its ruling should extend to the class in the *JGG* proceedings. *JGG* Summ. J. Op. at 3.

99.    While the planes sat on the tarmac in Harlingen, holding men in chains who had

30

been falsely promised that they were being sent back to Venezuela, the terms of the U.S.–El Salvador deal were further publicized through nationwide reporting: the United States would pay $6 million to El Salvador to imprison approximately 300 alleged Venezuelan Tren de Aragua members at El Salvador's notorious mega-prison.[49] The monetary agreement, as well as the *JGG* proceedings, were widely reported in the media throughout the afternoon.

100.    As the *JGG* proceedings continued under intense public scrutiny and widespread reporting, the three GlobalX planes sat on the tarmac, holding Plaintiffs and the hundreds of other Class Members, shackled at the hands, across the waist, and feet, destined for CECOT.

101.    As Plaintiffs and other Class Members waited in the planes, they were repeatedly told by U.S. officials, in the presence of GlobalX staff, that they would soon be home in Venezuela.

102.    GlobalX staff, however, knew this was not true. Indeed, Defendants *necessarily* understood that the flights' destination was El Salvador, not Venezuela, by virtue of piloting the planes and coordinating and operationalizing the flight plan.

103.    At 3:53 p.m. ET on March 15, 2025, the Administration publicly issued the Alien Enemies Act Proclamation.

104.    At 5:26 p.m. ET on March 15, 2025, approximately an hour and a half after the Proclamation was finally published and 26 minutes after the scheduled start of the hearing to determine the lawfulness of the removals, GlobalX Flight 6143, the first flight, took off from Harlingen with Plaintiff Reyes Barrios on board.

105.    At 5:44 p.m. ET, the second plane, GlobalX Flight 6145, departed with Plaintiff Chirinos Romero on board.

106.    Around 6:45 p.m. ET, while two of GlobalX's planes were mid-flight, Judge

---

[49] *See supra* note 35.

Boasberg certified a class of individuals subject to removal under the Alien Enemies Act in the *JGG* proceedings and prohibited the government from removing them for fourteen days. Mar. 15, 2025 Hearing Tr., *J.G.G.*, No. 25-cv-00766, ECF No. 20.

107.    In an oral order that was clearly intended to be communicated to Defendants, Judge Boasberg directed the Administration to turn around any planes carrying people being removed under the Proclamation: "You shall inform your clients of this immediately any plane containing these folks that is going to take off or is in the air needs to be returned to the United States. . . . However that's accomplished, whether turning around a plane or not embarking anyone on the plane . . . I leave to you."[50]

108.    Despite the Court's oral order, Defendants did not alter the planes' course.

109.    By 7:26 p.m. ET, when Judge Boasberg's written order effectuating his oral order was posted on the docket, Defendants still did not alter the planes' course.

110.    Ten minutes later, at 7:36 p.m. ET, GlobalX Flight 6122, the third rendition flight, containing Plaintiff Blanco Bonilla, departed. By then, Plaintiff Blanco Bonilla had been wearing chains and sitting on the tarmac for hours upon hours.

111.    This flight departed after both the oral order and the written order were given to ground the flights. According to later representations from the Administration, the third flight allegedly did not contain individuals removed solely pursuant to the Proclamation, but individuals who were removable under Title 8 of the Immigration and Nationality Act.

112.    That evening, all three GlobalX flights landed at Comayagua, Honduras. Thus, GlobalX flights rushed to take off to leave the United States, only to wait hours on the tarmac in Honduras. Despite Judge Boasberg's orders to return to the United States, all three GlobalX planes

---

[50] Mar. 15, 2025, Hearing Tr. at 43:11–18, *J.G.G.*, No. 25-cv-00766, ECF No. 20.

took off again several hours later. Their destination: El Salvador.

113.    U.S. officials and flight staff forbade Plaintiffs and Class Members from opening the window shades on the planes so that they would not discover their true destination. Some Class Members were even physically harmed by escort officers, in the presence of GlobalX staff, when they attempted to do so.

114.    The mood aboard each plane grew thick with tension as Plaintiffs and Class Members became increasingly suspicious of the nature of these flights and their final destination.

115.    Defendants could have redirected or canceled the flights under the terms of their contracts and applicable regulations. They chose not to. Indeed, under 14 C.F.R. Part 121,[51] the pilots in the air were "in command of the aircraft."[52] As such, the pilot in command may have the flight canceled or redispatched if, in his opinion, "the flight cannot operate or continue to operate safely as planned or released."[53]

116.    Despite the obvious safety concerns—panic rising on board, passengers shackled across their wrists, waists, and ankles for hours, violence on the flights, and the foreseeable likelihood of torture and harm upon landing in El Salvador—Defendants did not alter flight plans. Instead, Defendants evaded or ignored judicial oversight and the foreseeable risk of torture and successfully delivered Plaintiffs and the Class to El Salvador for imprisonment at CECOT.

**B.    Allowed Aboard, Salvadoran Officials Abuse Plaintiffs and Class Members on GlobalX Planes in Front of GlobalX Employees.**

117.    The first GlobalX flight left Honduras at 11:39 p.m. ET and landed in San Salvador,

---

[51] Feb 2024 SOW, *supra* note 7 at 17 ("All flights must be operated by an FAA-certified air carrier/commercial operator under 14 CFR Part 121 or 135 and in accordance with FAA/ICAO authorizations and regulations.").

[52] 14 C.F.R. Part 121.535(d).

[53] 14 C.F.R. Part 121.535(c)(3).

El Salvador, thirty-one minutes later at 12:10 a.m. ET on March 16, 2025.

118. The second GlobalX flight left Honduras at 11:43 p.m. ET and arrived in San Salvador thirty-five minutes later, at 12:18 a.m. ET on March 16.

119. The third GlobalX flight left Honduras at 12:39 a.m. ET on March 16 and arrived at 1:08 a.m. E.T.

120. The terror faced by detainees in El Salvador began almost immediately upon arrival, as the planes landed to "an ocean of soldiers and police, an entire army to apprehend them."[54]

121. When Plaintiffs and other Class Members realized they had landed in El Salvador, they attempted to plead with U.S. officials and GlobalX staff onboard the flights, begging to stay on the planes so they could be deported back to Venezuela, as promised, even trying to tie themselves to the plane with their seatbelts.

122. In response, some GlobalX staff mocked Class Members for being afraid to disembark and allowed Salvadoran security forces, armed and militarized, to board—where they began brutally beating Plaintiffs and the Class to force them to disembark. U.S. officials even pulled out gas masks and threatened to tear gas the plane, in view of GlobalX flight staff.

123. In front of GlobalX staff, Salvadoran authorities "began forcing the shackled men off—shoving them, throwing them to the ground, hitting them with their batons."[55]

124. Plaintiffs and other Class Members were "forcefully led off planes by heavily armed Salvadoran authorities," cuffed, punched, and pushed down the stairs descending from the

---

[54] Holsinger, *supra* note 1; *see also Now That They're Free, Venezuelan Men Want the World to Know What They Endured in CECOT*, Vanguard News Grp. (Aug. 1, 2025), https://davisvanguard.org/2025/08/cecot-venezuela/.

[55] *Now That They're Free*, *supra* note 54.

GlobalX planes.[56] Shackled at the ankles and wrists, the men were bent, flanked, and "marched into armored vehicles."[57]



*3 - Salvadoran officials dragging a detainee from a GlobalX plane[58]*

---

[56] Camilo Montoya-Galvez, *Here Are the Names of the Venezuelans Deported by the U.S. to El Salvador*, CBS News (Mar. 20, 2025), https://www.cbsnews.com/news/venezuelans-deported-el-salvador-names.

[57] *Id.*

[58] Nathan Layne et al., *Trump Administration Deports Venezuelans Despite Court Order, Says Judge Has No Authority*, Reuters (Mar. 17, 2025), https://www.reuters.com/world/us/us-removes-hundreds-alleged-venezuelan-gang-members-under-now-blocked-authority-2025-03-16/.



*4 - Detainee forced off GlobalX plane amid a massive security force[59]*

125.    Despite its employees directly observing what awaited Plaintiffs and other Class Members upon arrival as the first and second planes landed in El Salvador, GlobalX landed a third plane in El Salvador.

126.    The third flight, Plaintiff Blanco Bonilla's flight, departed at 12:39 a.m. ET from Honduras, about thirty minutes after the first plane landed. That is, before the third plane even took off for El Salvador, GlobalX had actual, contemporaneous knowledge that armed Salvadoran security forces were swarming the tarmac, preparing to assault the men on its planes.

127.    Like Plaintiffs Reyes Barrios and Chirinos Romero, Plaintiff Blanco Bonilla was forcibly removed from the plane, with Salvadoran forces flanking him on both sides. He was beaten, dragged, punched, and kicked, while still shackled at his wrists, waist, and feet.

128.    Plaintiffs and Class Members were thrown onto armored vehicles destined for CECOT and bound with further restraints.

---

[59] Holsinger, *supra* note 1.

129. On the ride, they received additional abuse. A Salvadoran official beat Plaintiff Reyes Barrios on the head with a baton, saying, "Welcome to El Salvador, you son of a bitch."

130. As Salvadoran personnel hurled insults at the men, calling them terrorists and criminals, Plaintiffs and the Class pleaded that they were only migrants.

131. Immediately after the renditions, President Bukele, President Trump, and Secretary Rubio publicly expressed their elation—each sharing a video on social media set to martial music showing Salvadoran security forces pulling shackled men off the GlobalX planes with batons, bending and leading them down the planes' steps to a sea of security personnel, and hauling them into armored vehicles.[60] Secretary Rubio further thanked Bukele for his "assistance and friendship."[61] The same day, White House Press Secretary Karoline Leavitt issued an official press statement that the "heinous monsters" removed to El Salvador, who "rape, maim and murder for sport," "will no longer be able to pose any threat to the American People."[62]

## III.   The Rendition Scheme Succeeds.

### A.   Plaintiffs and the Class are Tortured, Humiliated, and Imprisoned *Incommunicado* at CECOT.

132. CSI and GlobalX willingly carried out the rendition of Plaintiffs and the Class, despite knowing or reasonably foreseeing that renditions to CECOT were unlawful, in violation of human rights, and cruel, inhuman, degrading, and torturous.

133. Upon arrival at CECOT, Plaintiffs and the Class were immediately subject to humiliating intake procedures—guards grabbed them by the neck and hair and forcibly bent them

---

[60] *See* Nayib Bukele (@nayibbukele), X (Mar. 16, 2025), https://x.com/nayibbukele/status/1901245427216978290.

[61] Layne, *supra* note 58.

[62] *Statement from the Press Secretary*, The White House (Mar. 16, 2025), https://www.whitehouse.gov/briefings-statements/2025/03/statement-from-the-press-secretary-50c7/.

37

as they were dragged into the mega prison. They were forced to kneel as their heads were roughly shaved and guards spat on them and stripped them naked.[63]

134.    Shaved and wearing the mandatory white boxers, shirts, shorts, socks, and slip-on shoes, the men were forced to the prison floor. As a group, they heard the prison director's welcome—telling Class members, "[y]ou have arrived in Hell."[64] He described how they would die there, serving century-long sentences.



*5- Salvadoran officials forcing shackled detainees to the ground [65]*

135.    These procedures were designed to humiliate Plaintiffs and the Class and to impose psychological and physical torment. As a photojournalist permitted to witness their arrival at CECOT observed: "They move them fast and hard. And they intentionally want them to feel that

---

[63] *United States and El Salvador: A Scheme to Deport Migrants from the US to a "Human Rights Black Hole"*, Global Detention Project (Apr. 8, 2025), https://www.globaldetentionproject.org/united-states-and-el-salvador-a-scheme-to-deport-migrants-from-the-us-to-a-human-rights-black-hole.

[64] *"You Have Arrived in Hell," supra* note 3.

[65] Holsinger, *supra* note 1.

they're powerless. . . . That's the beginning of their lesson . . . which is total powerlessness."[66]

136.    Plaintiffs and the Class were forcibly directed, in the crouched-down position, to Module 8, a section of CECOT designated specifically for them, where they were held separately from other CECOT prisoners.



*6 - Detainees subjugated and humiliated by CECOT personnel* [67]

137.    Their cells had "steel planks for bunks, no mats, no sheets, no pillow. No television. No books. No talking. No phone calls and no visitors."[68] Those who might have been allowed a mattress for a time would have it taken arbitrarily. They spent approximately 23.5 hours a day in those cages. They never went outdoors.

138.    Every day, they were forced to assume the "search position," wherein detainees

---

[66] Will Croxton, *Photojournalist Witnesses Venezuelan Migrants' Arrival in El Salvador: "They Had No Idea What Was Coming"*, CBS News (Apr. 6, 2025), https://www.cbsnews.com/news/photojournalist-witnesses-venezuelan-migrants-arrival-in-el-salvador-60-minutes/.

[67] Layne, *supra* note 58.

[68] Holsinger, *supra* note 1.

were forced to kneel, hands cuffed behind their backs, typically for 30 to 40 minutes at a time but sometimes up to several hours. During these "searches," guards often beat them with batons, kicks, and closed fists and stomped on their backs.

139.    Plaintiffs and the Class were systematically beaten for violating minor prison rules such as bathing at the wrong time of day, requesting medical care, or decrying their conditions. For even speaking with one another, guards would cuff the men, remove them from their cells, and beat them with batons. Plaintiffs and Class Members were abused countless times.

140.    The abuse would pause momentarily a few days in advance of important official visits, such as the visits of then-Secretary Noem, members of the U.S. Senate, and the International Committee of the Red Cross. Plaintiffs and the Class were also given some basic provisions like mattresses, soap, and extra food prior to such visits. These items were promptly taken away after the visits, and guards resumed regular beatings.

141.    Many Class Members were seriously injured as a result of this abuse. Plaintiff Blanco Bonilla, for example, was beaten for showing "disrespect" after refusing to disrobe and show his tattoos during then-Secretary Noem's visit.

142.    One Class Member's leg was seriously injured. The lack of hygiene and medical treatment resulted in multiple abscesses and an infection of worms coming out of his wounds, necessitating surgery and confining him to a wheelchair. Another Class Member was beaten so severely on multiple occasions that he suffered serious kidney damage.

143.    Class Members attempted to protest the brutal conditions they experienced, including through hunger strikes and other forms of protest.

144.    In response, they were attacked by dozens of riot police, who shot them at close range with rubber bullets. Class Members were hit in the head, face, chest, hands, and legs and

severely injured. One Class Member observed a fellow detainee attempt to shield his face by holding up his hands; as a result, part of his finger was blown off.

145. Plaintiff Chirinos Romero was shot in the head at close range with rubber bullets. The shots left him unconscious, and he still bears scars and headaches from the attack. He received no medical care despite the severity of the injury.

146. Plaintiff Reyes Barrios saw riot police fire tear gas and rounds of rubber bullets into a nearby cell, leaving Class Members with broken teeth and bloodied faces. Plaintiff Reyes Barrios was also beaten, left in boxers and shorts to sleep in the fetal position on the floor of his cell.

147. Multiple Class Members harmed themselves during their time in detention, including by cutting their arms, legs, chests, and faces to conduct what they called a "blood strike" in order to put an end to the extreme physical and psychological torture they suffered at the hands of guards. In response, CECOT personnel brutalized the detainees, including with pepper spray.

148. Those accused of violating prison rules were often taken to a group of punishment cells known as "the Island," where some of the most severe mistreatment and abuse took place, including relentless beatings by guards who concealed their identities with hoods, as well as physical and sexual abuse.

149. The Island's cells were even smaller than the other cells—small dark spaces with room for only a few people standing, with a cement bed, toilet, and sink. There was no light, except for any that entered through a small hole through which food could be passed into the cell. Those held in the Island were left in complete isolation, without the ability to know if it was day or night.

150. Plaintiff Chirinos Romero was sent to the Island several times, for days at a time, for protesting the prison conditions or because he did not want to eat. CECOT officials took him out of his cell in handcuffs and beat him down the hallway to the Island, then beat him again before

locking him in the Island alone. When they came back, they beat him again before returning him to his cell.

151.    Plaintiff Reyes Barrios was sent to the Island for bathing at the wrong time of day to relieve his dizziness from the relentless heat. When he was discovered, CECOT officials took him out of his cell, handcuffed him, and pushed his forehead against the wall as they struck his back. In the Island, he was held while guards beat him with their hands and feet and kicked him.

152.    One Class Member was sent to the Island after refusing to kneel in his cell for a search. Five guards attacked and beat him, causing him to vomit blood. He was then sent to the Island, where he was held for four days, denied water the entire time. Guards beat him daily. When he left the Island, he continued to spit blood for two days but could not seek medical attention for fear of additional abuse.

153.    Another Class Member was sexually abused by CECOT staff at the Island and forced to perform oral sex on one of the guards. Others stroked their batons against his skin to humiliate him while the abuse occurred.

154.    Prison guards also inflicted verbal and psychological abuse on detainees on a daily basis—including, in Plaintiff Reyes Barrios' case, encouragement to commit suicide.

155.    CECOT guards told Plaintiffs and the Class that they would "never leave alive;" that they would never be released; that no one even knew they were held there; and that their families and government had abandoned them.[69]

156.    Because Plaintiffs and other Class Members were held *incommunicado*, they had no way of knowing that guards were in fact not telling the truth with respect to their families. Despite repeated requests, they were unable to communicate with anyone on the outside, including

---

[69] *"You Have Arrived in Hell," supra* note 3.

their families or legal counsel.

157.    Nor were their families ever told, other than what they could glean from the media, that their loved ones were rendered to CECOT.

158.    Many family members and lawyers attempted to use ICE's Online Detainee Locator System to determine what happened to Plaintiffs and the Class. For some Class Members, their names continued to appear in the system as though they were still detained in the United States, awaiting their asylum hearings or other legal proceedings. Other Class Members had been removed from the system entirely. Relatives who called U.S. detention centers and ICE officers received no answers.

159.    To date, the United States has never published a list of names of those confined at CECOT or confirmed the identities of the men they rendered there.

160.    Plaintiffs and Class Members were also systematically deprived of medical care. Some men were even abused for seeking medical attention. One Class Member with diabetes who required insulin was not given the correct medication; one day during a search, guards found his body cold, convulsing, and foaming at the mouth.

161.    Plaintiff Blanco Bonilla never received regular hypertension medication, despite repeatedly informing prison guards and officials that he did not feel well and required medication. Instead, for a temporary period, he was given another type of pill that seemed to have no effect on his hypertension. He was never told what it was, and guards often withheld it as punishment or would forget to administer it.

162.    Plaintiffs and the Class endured constant thirst in the brutal heat of their cells. They were held under bright, hot lights that were kept on 24 hours a day and created an inferno of heat inside their cells, leaving them unable to rest.

43

163.    Yet, Plaintiffs and their cellmates received only a limited amount of water per day to be used for all needs, including bathing, the toilet, and drinking. The water was so limited and filthy that Plaintiffs and the Class preferred not to drink, even during the limited times when there was water available as the water sickened many detainees. Indeed, Plaintiff Reyes Barrios would have diarrhea from drinking it. Plaintiff Blanco Bonilla now suffers from kidney stones, which he attributes to the limited and poor-quality drinking water.

164.    Minimally nutritious food was also withheld from Plaintiffs. When served, food was often spoiled or unhygienic. Meals often included vermin like cockroaches or material such as human hair.

165.    This abuse—verbal threats, forcible shaving and stripping, sexual violence, extreme beatings, and the denial of adequate water, food, rest, and medical treatment—was designed to, and did, subjugate, humiliate, and inflict severe psychological and physical harm upon Plaintiffs and the Class.

166.    Indeed, the cruelty was celebrated by the Administration. In a televised visit to CECOT just weeks after the renditions, then Secretary of Homeland Security Noem used tortured Plaintiffs and Class Members as a backdrop to amplify a message of punishment and deterrence: "[I]f you come to our country illegally, this is one of the *consequences* you might face."[70] At a

---

[70] Will Grant, *Trump Official Visits Mega-Jail Holding Deported Venezuelans*, BBC (Mar. 26, 2025), https://www.bbc.com/news/articles/cj4nrdnp018o (emphasis added); *see also DHS Releases New Nationwide and International Ads Warning Illegal Aliens to Self-Deport and Stay Out*, Dep't of Homeland Sec. (Apr. 21, 2025), https://www.dhs.gov/news/2025/04/21/dhs-releases-new-nationwide-and-international-ads-warning-illegal-aliens-self ("President Trump and I have a clear message to those in our country illegally: LEAVE NOW. If you do not self-deport, we will hunt you down, arrest you, and deport you."); *Remarks: Donald Trump Holds a Bilateral Meeting with Nayib Bukele of El Salvador - April 14, 2025*, at 06:45, Roll Call (Apr. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-bilat-nayib-bukele-el-salvador-april-14-2025/ ("It has been wonderful for us to be able to have somewhere to send the worst of the worst and someone to partner with. And we'd like to continue that partnership because

June 27, 2025, press conference, while Plaintiffs and the Class were being actively tortured, the President boasted that when the United States transfers men to El Salvador's "hell of a [prison] system," a "brilliant system," "they don't get out."[71] And even after Plaintiffs and the Class were released, then-Secretary Noem invoked the horrors of CECOT as a direct threat to migrants who remained in the United States: "If you are in America illegally, you could find yourself in CECOT . . . . Avoid arrest and self deport now using the CBP Home App."[72]

167.    During the entirety of their imprisonment at CECOT, the United States maintained custody over Plaintiffs and the Class and yet allowed them to languish in suffering.

168.    On July 18, 2025, as part of a prisoner exchange agreement negotiated between the United States and Venezuela, Plaintiffs and the other Class Members were released and taken back to Venezuela.

169.    The physical and psychological impacts of Plaintiffs' and the Class's rendition, imprisonment, and torture endure today.

170.    In addition to the physical impact of kidney stones, Plaintiff Blanco Bonilla suffers painful flashbacks and has trouble sleeping. During the day, he feels disassociated and unable to be present. While Mr. Blanco Bonilla has actively sought and received mental health care to manage these symptoms, he continues to experience anguish, suffering, and severe mental distress.

---

it's been a powerful message of consequences."); *id.* ("Mr. President, you wanted people to know that there was [sic] consequences if you break our laws and harm our people and endanger families. And this is a clear consequence for the worst of the worst that we have somewhere to put them.").

[71] *Press Conference: Donald Trump Hosts a Press Conference at the White House - June 27, 2025*, at 00:20:29, Roll Call (June 27, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-white-house-june-27-2025/.

[72] Press Release, *Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space*, Dep't of Homeland Security (Sep. 3, 2025), https://www.dhs.gov/news/2025/09/03/louisiana-lockup-new-partnership-dhs-and-state-louisiana-expand-detention-space.

171. In addition to the physical scars he bears from being shot at close range with rubber bullets, Plaintiff Chirinos Romero suffers daily headaches and often severe migraines. His migraines leave him restless, leading him to schedule work to coincide with the episodes as a distraction from the pain. He is unable to sleep through the night, and sleeps in short bursts throughout the day. Plaintiff Chirinos Romero continues to experience anguish, suffering, and severe mental distress.

172. In addition to the physical beatings he suffered at CECOT, Plaintiff Reyes Barrios continues to experience insomnia and trauma. He often experiences flashbacks to his detention and anxious thoughts. Mr. Reyes Barrios continues to experience anguish, suffering, and severe mental distress.

**B.      CSI and GlobalX Profit from Their Participation in the Rendition Scheme.**

173. CSI's "interim" no-bid contract with ICE, pursuant to which it operated the CECOT rendition scheme, is now worth up to $585.5 million, with $562 million obligated and almost $500 million outlaid.

174. Almost one year later, in February 2026, CSI was listed as the single *highest-value* recipient of ICE contracts, with the company's revenue from ICE in the first year of the Administration totaling $1.23 billion. CSI continues to dominate ICE contracting, recently receiving the largest new ICE Air contract for 2026, with a potential value of $1.5 billion. It remains the contractor responsible for brokering nearly all ICE Air flights for the Administration, which have reached unprecedented levels.

175. GlobalX, though created in 2021 to carry collegiate athletes and sports teams, today operates 64% of ICE Air charter flights and operated 74% of ICE Air charter flights in 2024.

176. GlobalX's complicity with ICE reversed its previously dire corporate financial straits. GlobalX reported a net loss of $21 million in 2023. But by Q2 of 2024, after receiving the

subcontract award from CSI, GlobalX announced that its revenues increased by 83%, reflecting the "best quarter in GlobalX's short corporate history."[73]

177. From 2023 to 2025, GlobalX profits exploded by over 100%, and the company's earnings tripled. GlobalX's Chief Financial Officer attributed GlobalX's revenue boom to ICE.

178. Since the rendition scheme, GlobalX began obfuscating its work for ICE, now using dummy call signs and hiding its planes' tail numbers from tracking websites.

## CLASS ALLEGATIONS

179. Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23, as representatives of the Class, defined as follows:

> All Venezuelan nationals who were transported by Defendants from the United States to El Salvador for confinement at CECOT on or about March 15 or 16, 2025 (the "Class" or "Class Members").

> Excluded from the Class are those who, following a full and fair exercise of due process, the U.S. government proves, consistent with its applicable burden of proof, to be members of Tren de Aragua or any other entity designated as a Foreign Terrorist Organization ("FTO"), pursuant to a final adjudication or order. Judge Boasberg found that the men whom the government labeled as "alien enemies" before their rendition to CECOT were denied their due process rights, and he ordered the U.S. government to "facilitat[e] a meaningful opportunity" for the men "to contest their designation" in subsequent hearings. *JGG* Summ. J. Op. at 41. At the time of this filing, no such meaningful opportunity has been afforded to Class Members. Accordingly, for purposes of this action, no Class Member has been proven to be a member of Tren de Aragua or any other FTO, and none is otherwise known to undersigned counsel to be a member of Tren de Aragua or any other FTO. To be clear, even were such status later confirmed as to any individual, it would not affect their entitlement to protection from rendition to torture. Also excluded from the Class are Anderson José Querales Martinez; Christian Bill Petterson Torres; Héctor Oswaldo Rosal Gelvez; Jordan Jesús Hung Mendoza; Leoner Alberto Palacios Rebolledo; Rolando José Barreto Villegas; Yermain Alexander Lugo Acosta; and Yordano Albeiro Contreras González.

---

[73] Press Release, Global Crossing Airlines Grp. Inc., *Global Crossing Airlines Reports Second Quarter 2024 Financial Results*, GlobalX (Aug. 13, 2024), https://www.globenewswire.com/news-release/2024/08/13/2929619/0/en/Global-Crossing-Airlines-Reports-Second-Quarter-2024-Financial-Results.html.

180. The Class meets all required elements of Federal Rule of Civil Procedure 23.

181. *Numerosity.* The Class is so numerous that joinder of all members is impracticable. The estimated number of Class Members is over 230.

182. *Typicality.* Plaintiffs' claims are typical of, and not antagonistic to, the claims of the Class, such that Plaintiffs can fairly and adequately represent and protect the interests of Class Members. All Class Members were subject to the same scheme to render them to CECOT on planes belonging to Defendants, and ultimately subject to detention in the same facility, where they suffered similar abuses and endured similar psychological and physical harms.

183. *Adequacy of Representation.* Plaintiffs have retained counsel with substantial experience litigating complex human rights cases and class actions, including substantial experience litigating complex class actions within this District and human rights cases in federal courts throughout the country.

184. *Commonality.* Plaintiffs and all members of the Class suffered the same common injury of being rendered to CECOT, in violation of international human rights law and federal and state law, as a result of the same unlawful conduct by CSI, GlobalX, and their co-conspirators. Plaintiffs and members of the Class may also have experienced individualized injuries, including injuries stemming from sexual assault, aggravated physical abuse, denial of medical care, and solitary confinement.

185. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be particular to individual Class Members, since CSI and GlobalX have acted on grounds generally applicable to the Class.

186. Common questions of law and fact regarding CSI and GlobalX's awareness of the risks associated with the rendition, including torture or harm, and complicity in international law

48

violations, predominate over any individual issues.

187. Specifically, questions of law and fact common to the Class include, but are not limited to:

a. Whether the Administration, CSI, and GlobalX conspired to carry out the CECOT renditions;

b. Whether rendering Class Members to CECOT constituted violations of safe conducts, *refoulement*, torture, enforced disappearance, arbitrary detention, or cruel, inhuman, or degrading treatment under international law;

c. Whether Defendants knew or should have known that rendering Class Members to El Salvador for confinement at CECOT would result in their extreme physical and psychological suffering;

d. Whether Class Members are entitled to general or presumed damages for the affront to their liberty and human dignity rights caused by their rendition to CECOT;

e. The proper measure of damages; and

f. The contours of appropriate equitable relief to remediate the effects of the challenged conduct.

188. Class treatment of Plaintiffs' claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

189. Additionally, the members of the Class are ascertainable—including names,

49

identities, and contact information contained in records produced or generated by the U.S. government, as well as information published by news media or obtained through legal proceedings. In addition, by information and belief, the identities of Class Members are in the possession and control of either or both CSI and GlobalX.

## CAUSES OF ACTION

## COUNT I – CIVIL RIGHTS CONSPIRACY
### 42 U.S.C. § 1985(2)

190.    Plaintiffs reallege and reincorporate the preceding paragraphs.

191.    42 U.S.C. § 1985(2) prohibits two or more persons to conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully.

192.    Defendants entered into precisely such a conspiracy. From 1:00 a.m. ET on March 15, 2025, when the *JGG* proceedings were initiated, through the renditions to CECOT and for months thereafter, proceedings were pending in a court in this District—a court of the United States. Plaintiffs and the Class were parties or witnesses to that action. Defendants knew the *JGG* proceedings were pending, not least because some of the named plaintiffs in *JGG* were eventually removed from Defendants' planes.

193.    Additionally, Plaintiffs and Class Members on all three flights had direct, percipient knowledge of the rendition scheme and its execution—the deception about the planes' true destination, the conditions aboard Defendants' aircrafts, and their delivery to CECOT—and each was an actual or prospective witness to matters then pending in *JGG*.

194.    By agreeing with the Administration and its agents to render Plaintiffs and the Class to El Salvador while the *JGG* proceedings were pending, Defendants conspired and reached a mutual understanding to deter those parties and witnesses, by force, intimidation, and threat, from

50

attending and testifying in the proceedings, and to defeat the due course of justice by attempting to place them beyond the judiciary's reach before it could rule and then rendering them to *incommunicado* detention for months thereafter.

195.    The force, intimidation, and threat were literal. Plaintiffs and the Class were shackled at the hands, feet, and waist aboard Defendants' aircrafts; deceived about where the planes were taking them; flown out of the country during the recess of an emergency hearing convened to halt their removal; and delivered by Defendants into the hands of armed Salvadoran forces who beat them off the planes and forcibly delivered them to CECOT.

196.    In furtherance of the conspiracy, and as overt acts in furtherance of its object, Defendants, with knowledge of the pending *JGG* proceedings:

- operated their aircrafts in a rendition scheme they knew was being hurried to outrun federal court review;

- launched Flight Nos. 6143 and 6145 during the recess of the emergency hearing called to determine the lawfulness of the removals;

- declined to alter the planes' course after the Court's oral and written orders directing that any plane carrying the affected individuals be returned to the United States;

- held the first two planes on the ground at Comayagua, Honduras for hours and then flew Class Members onward to El Salvador after their passengers had become parties protected by this Court's order; and

- delivered Plaintiffs and the Class into a notorious mega-prison from which, as Salvadoran officials publicly boasted, no one would leave—cutting them off from this Court, their counsel, and the judicial process for over four months and through the present day.

197.    The purpose and effect of these acts, as this Court has found, was to prevent Plaintiffs and the Class from being able to "secure prior judicial review" of their renditions, *JGG* Summ. J. Op. at 18, including via the *JGG* proceedings themselves. Indeed, attempting to destroy the practical ability of Plaintiffs and the Class to attend, to prosecute, and to testify in a pending federal case, including *JGG* itself, as parties or witnesses or both, was a key goal of the conspiracy.

51

198. The conspiracy was at least partially successful in that regard. Rendered to CECOT and held *incommunicado* for over four months, Plaintiffs and the Class were prevented from attending, participating in, communicating with counsel in, or testifying in the *JGG* proceedings—which involved and sought to prevent their own renditions—and from seeking habeas relief in other federal proceedings.

199. The agreement to deter and obstruct, and the intent to do so, are established by the conspirators' own words and conduct, as alleged above. The day before any suit was filed, Administration officials resolved that the planes would "take off no matter what" and that the Administration would, if necessary, tell the courts "f--- you" and ignore any order to stop the removals. Government counsel then concealed the flights' departure at the 5:00 p.m. hearing on March 15. The Secretary of Homeland Security—who oversaw Defendants' contracts—has admitted that the decision to send the planes onward despite the Court's orders was hers. Defendants joined and advanced this conspiracy with knowledge of its object, supplying the aircrafts, crews, and clearances that alone made it possible to spirit Plaintiffs and the Class beyond the judiciary's reach before it could rule.

200. Defendants' actions or omissions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

201. Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

### COUNT II – CIVIL RIGHTS CONSPIRACY
### 42 U.S.C. § 1985(3)

202. Plaintiffs reallege and reincorporate the preceding paragraphs.

203. By agreeing with the U.S. government and its agents to render Plaintiffs and the

Class to El Salvador for confinement at CECOT, where they faced a foreseeable risk of torture and suffering, on the basis of their race, ethnicity, alienage, or national origin, Defendants conspired and reached a mutual understanding with the Administration to deprive Plaintiffs and the Class of the equal protection of the laws of the United States and of constitutionally protected liberty interests, in violation of 42 U.S.C. § 1985(3).

204. By rendering Plaintiffs and the Class to El Salvador for confinement at CECOT, the object of the conspiracy was to deter migration to the United States and to terrorize and punish migrants, specifically Latin American and Venezuelan migrants, through state-sanctioned *refoulement* to punitive confinement, torture, and suffering.

205. In furtherance of the conspiracy, and as overt acts in furtherance of its object, Defendants:

- entered into an unusual no bid "surge" air charter contract and subcontract with ICE to provide large capacity charter air services for the March 2025 flights to El Salvador;

- positioned and staffed three GlobalX aircrafts in Harlingen, Texas, providing atypical capacity and schedules;

- prepared and transmitted flight manifests, coordinated clearances, and obtained landing and overflight permissions with San Salvador and other authorities;

- agreed to and did carry out three rendition flights from Harlingen, Texas to El Salvador; and

- knowingly delivered Plaintiffs and the Class, shackled and under guard, into a notoriously brutal mega-prison, despite knowing or recklessly disregarding the risk that Plaintiffs and the Class would be tortured, systematically abused, and confined in punitive conditions.

206. Defendants' actions or omissions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

207.    Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

## COUNT III – FAILURE TO PREVENT CIVIL RIGHTS CONSPIRACY
### 42 U.S.C. § 1986

208.    Plaintiffs reallege and reincorporate the preceding paragraphs, including Count I and II's allegations of a conspiracy under 42 U.S.C. §§ 1985(2) and (3).

209.    Having knowledge of the conspiracy to violate the civil rights of Plaintiffs and the Class, as alleged above in Counts I and II, and having the power, through their control over the provision or withdrawal of aircrafts, flight crews, charter services, and logistical and permitting support, to prevent or to aid in preventing the commission of the wrongful acts, Defendants willfully or negligently failed to take reasonable and available efforts to prevent the wrongful acts alleged herein, in violation of 42 U.S.C. § 1986.

210.    Defendants failed to take reasonable and available efforts to prevent the rendition flights to El Salvador and the confinement of Plaintiffs and the Class at CECOT—including, but not limited to, declining to operate the flights, refusing to supply aircrafts or flight crews, cancelling or delaying departures, refusing to obtain or use landing and overflight permits, or otherwise withdrawing their participation in the rendition—despite knowing or recklessly disregarding the risk that Plaintiffs and the Class would be tortured, systematically abused, and confined in punitive conditions at CECOT.

211.    Defendants likewise failed to take reasonable and available efforts to prevent the intervention and obstruction of Plaintiff and the Class's access to the judiciary, including the *JGG* proceedings, and from testifying to any matter pending therein.

212.    Plaintiffs' and Class Members' claim did not begin to accrue until their imprisonment at CECOT ceased.

213.    Defendants' actions or omissions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress, which injuries Defendants, by the exercise of reasonable diligence, could have prevented in whole or in part.

214.    Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

## COUNT IV – SAFE CONDUCTS
## ALIEN TORT STATUTE, 28 U.S.C. § 1350

215.    Plaintiffs reallege and reincorporate the preceding paragraphs.

216.    The acts alleged herein constitute violations of safe conducts under customary international law, as reflected in international instruments, international and domestic judicial decisions, and other authorities.

217.    Under contemporary customary international law, as well as the "law of nations" in force at the time of the Alien Tort Statute's enactment in 1789, foreign nationals are entitled to protection of their person and property, to due process, to equal treatment as nationals, and to a minimum standard of treatment.

218.    At all relevant times, Plaintiffs and the Class were entitled to safe passage within the United States.

219.    Defendants intentionally and knowingly participated in, conspired in, recklessly disregarded, and/or aided and abetted the violations of safe conducts of Plaintiffs and the Class by knowingly supplying and operating the aircrafts, flight crews, clearances, and other essential air-transport services needed to forcibly render Plaintiffs and the Class to El Salvador for confinement at CECOT, where they were held *incommunicado* in barbaric conditions and physically and psychologically tortured.

220.   Defendants' acts alleged herein also violated safe conducts by interfering with Plaintiffs' and Class Members' dignity and liberty interests and basic due process protections, including interference in ongoing judicial proceedings, in violation of the international minimum standard of treatment of foreign nationals.

221.   Defendants' actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

222.   Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

### COUNT V – FALSE IMPRISONMENT

223.   Plaintiffs reallege and reincorporate the preceding paragraphs.

224.   The acts alleged herein constitute false imprisonment under common law.

225.   Under common law, false imprisonment is the detention or restraint of one against his or her will without legal justification, including where the detention is unreasonable in length or manner.

226.   Defendants intentionally and knowingly participated in, conspired in, recklessly disregarded, and/or aided and abetted the detention of Plaintiffs and Class Members against their will and without legal justification by (1) knowingly supplying and operating the aircrafts, flight crews, clearances, and other essential air-transport and logistical services required to render them to El Salvador and to deliver them, shackled and under guard, to confinement at a notoriously brutal mega-prison in El Salvador, where they were held for an unreasonable length of time and in an unreasonable manner, in flagrant violation of their rights under U.S. and international laws and standards; and (2) willfully confining Plaintiffs and Class Members in GlobalX aircrafts for hours under the false pretenses that they were being transported to Venezuela, shackled at the hands,

56

feet, and waist for an unreasonable length of time and in an unreasonable manner, in flagrant violation of their rights under U.S. and international laws and standards.

227.     Plaintiffs' and Class Members' claim did not begin to accrue until their imprisonment at CECOT ceased.

228.     Defendants' actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

229.     Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

230.     Plaintiffs reallege and reincorporate the preceding paragraphs.

231.     Defendants willfully agreed to and did render Plaintiffs and Class Members to El Salvador for confinement at CECOT, despite knowing or recklessly disregarding the fact that the scheme was intended to terrorize, punish, and torture Venezuelan migrants.

232.     Defendants' conduct in knowingly supplying and operating the aircrafts, flight crews, clearances, and other essential air-transport and logistical services required to render Plaintiffs and the Class from the United States and deliver them, shackled and under guard, to confinement at a notoriously brutal mega-prison in El Salvador was extreme, outrageous, and was undertaken with the intent to cause, or in reckless disregard of the substantial certainty of causing, severe emotional distress to Plaintiffs and Class Members.

233.     Defendants' actions substantially and proximately caused or contributed to Plaintiffs' and Class Members' emotional distress. As a result, Plaintiffs and Class Members suffered damages, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

57

234.    Defendants acted willfully, callously, and wantonly, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

### COUNT VII – NEGLIGENCE

235.    Plaintiffs reallege and reincorporate the preceding paragraphs.

236.    As air-charter contractors responsible for transporting Plaintiffs and Class Members while they were under their physical control, Defendants owed Plaintiffs and Class Members a duty of reasonable care, including a duty to avoid exposing them to an unreasonable risk of physical or psychological harm and a duty to refrain from participating in transfers that would foreseeably result in torture, cruel, inhuman, or degrading treatment, arbitrary detention, or other serious abuses. Defendants breached their duty of care to Plaintiffs and Class Members, including to protect Plaintiffs and Class Members from an unreasonable risk of harm.

237.    There was a reasonably foreseeable risk that rendering Plaintiffs and the Class Members to El Salvador for confinement at CECOT would result in severe physical and psychological suffering, as CECOT had been widely reported and documented as a site of extreme brutality and human rights abuses well before the March 2025 flights.

238.    Defendants nonetheless chose to supply and operate the aircrafts, flight crews, clearances, and other essential air-transport and logistical services required to render Plaintiffs and the Class to El Salvador and to deliver them, shackled and under guard, to confinement at a notoriously brutal mega-prison in El Salvador. In addition to being negligent, the acts and omissions set forth herein were made in willful disregard for the rights of Plaintiffs and the Class and were reckless toward the safety of Plaintiffs and the Class.

239.    Defendants' actions directly and/or proximately caused and/or contributed to Plaintiffs' and Class Members' injuries, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

240.    Defendants acted negligently, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

## COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

241.    Plaintiffs reallege and reincorporate the preceding paragraphs.

242.    As air-charter contractors responsible for transporting Plaintiffs and Class Members while they were under their physical control, Defendants owed Plaintiffs and Class Members a duty of reasonable care, including a duty to avoid exposing them to an unreasonable risk of severe emotional harm.

243.    Defendants rendered Plaintiffs and Class Members to El Salvador for confinement at CECOT, even though they knew or, in the exercise of reasonable care, should have known that Plaintiffs and the Class would experience severe physical and psychological suffering there, including *incommunicado* confinement, torture, and cruel, inhuman, or degrading treatment.

244.    Defendants' conduct in knowingly supplying and operating the aircrafts, flight crews, clearances, and other essential air-transport and logistical services required to render Plaintiffs and the Class from the United States and deliver them, shackled and under guard, to confinement at a notoriously brutal mega-prison in El Salvador was extreme, outrageous, and created a foreseeable risk of severe emotional distress, and in fact, inflicted severe emotional distress on Plaintiffs and Class Members.

245.    Defendants' negligent actions and omissions directly and/or proximately caused and/or contributed to Plaintiffs' and Class Members' emotional distress. As a result, Plaintiffs and Class Members suffered damages, including but not limited to harm to human dignity, loss of liberty, humiliation, fear, and emotional distress.

246.    Defendants acted negligently, and Plaintiffs and the Class are entitled to an award of compensatory and punitive damages.

**PRAYER FOR RELIEF**

247. Plaintiffs demand a trial by jury and respectfully request:

   a. That the Court certify Plaintiffs' claims alleged herein for class treatment pursuant to Fed. R. Civ. P. 23;

   b. That the Court appoint the Named Plaintiffs to represent the Class;

   c. That the Court appoint Plaintiffs' counsel as counsel for the Class;

   d. That the Court award compensatory general (or otherwise presumptive) damages for the common violations of Plaintiffs' and Class Members' human and civil rights, in an amount to be determined at trial;

   e. That the Court award compensatory specific damages for any individualized injuries suffered by Plaintiffs and Class Members, in an amount to be determined at trial;

   f. That the Court award punitive damages for Plaintiffs and Class Members, in an amount to be determined at trial;

   g. That the Court award Plaintiffs and the Class their costs, expenses, and reasonable attorneys' fees in bringing this action;

   h. That the Court award Plaintiffs and the Class pre-judgment and post-judgment interest on all sums awarded;

   i. That the Court award equitable relief in the form of a rehabilitation fund to provide for mental health and other services for the benefit of Plaintiffs and Class Members; and

   j. Such other relief as the Court may deem just and proper.

Dated: July 17, 2026

*/s/ Mary S. Van Houten Harper*
Mary S. Van Houten Harper
(D.C. Bar No. 1045137)
Michael Hausfeld
(D.C. Bar No. 153742)
Amanda Lee Das-Gupta
(D.C. Bar No. 1619712)
Claire A. Rosset
(D.C. Bar No. 1719756)
Percy Metcalfe
(D.C. Bar No. 90029289)
**HAUSFELD LLP**
1200 17th Street NW, Suite 600,
Washington, DC 20036
(202) 540-7200
mvanhouten@hausfeld.com
mhausfeld@hausfeld.com
alee@hausfeld.com
crosset@hausfeld.com
pmetcalfe@hausfeld.com

Katie Beran*
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
kberan@hausfeld.com

James Gotz*
**HAUSFELD LLP**
One Marina Park Drive, Suite 14010
Boston, MA 022101
(617) 207-0600
jgotz@hausfeld.com

Ida Abhari
(D.D.C. Bar No. CA00193)
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94104
(415) 633-1908
iabhari@hausfeld.com

Michael Dell'Angelo
(D.D.C. Bar No. PA0090)
Michaela Wallin
(D.C. Bar No. 90036444)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
mdellangelo@bergermontague.com
mwallin@bergermontague.com

Mariyam Hussain*
**BERGER MONTAGUE PC**
110 N. Wacher Drive, Suite 2500
Chicago, IL 60606
(773) 666-4316
mhussain@bergermontague.com

Times Wang
(D.C. Bar No. 1025389)
**FARRA & WANG PLLC**
1543 Champa St., Suite 400
Denver, CO 80202
(202) 505-6227
twang@farrawang.com

Adam H. Farra
(D.C. Bar No. 1028649)
Colin Gillespie*
**FARRA & WANG PLLC**
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 505-5990
afarra@farrawang.com
cgillespie@farrawang.com

Anthony Enriquez
(D.D.C. Bar No. NY0626)
Sarah T. Gillman
(D.D.C. Bar No. NY0316)
**ROBERT & ETHEL KENNEDY HUMAN
RIGHTS CENTER**
88 Pine Street, Suite 801

New York, NY 10005
(917) 284-6355
enriquez@kennedyhumanrights.org
gillman@kennedyhumanrights.org

Sarah E. Decker
(D.D.C. Bar No. NY0566)
**ROBERT & ETHEL KENNEDY HUMAN
RIGHTS CENTER**
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@kennedyhumanrights.org

*Counsel for Plaintiffs and the Proposed Class*

*\* pro hac vice forthcoming*

62