**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CASE NO. 26-CV-02511-JEB**

ANDRY OMAR BLANCO BONILLA,
WILD YAHARE CHIRINOS ROMERO, and
JERCE EGBUNIK REYES BARRIOS, *on behalf of themselves and all others similarly situated,*

*Plaintiffs,*

v.

CSI AVIATION, INC.,
GLOBAL CROSSING AIRLINES GROUP INC., and
GLOBAL CROSSING AIRLINES, INC.,
d/b/a GLOBALX,

*Defendants.*

______________________________________________/

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT GLOBALX'S MOTION TO DISMISS

*/s/ Mark Pinkert*
Mark Pinkert*
Lindsey Lazopoulos Friedman*
Steven LaRussa*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2333 Ponce De Leon Blvd., Suite 600
Miami, FL 33134
(305) 379-1601
mpinkert@holtzmanvogel.com
**pro hac vice*

Kellen Dwyer (D.C. Bar No. 1008151)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2300 N Street NW, Suite 643
Washington, DC 20037

*Counsel for Global Crossing Airlines Group Inc. and Global Crossing Airlines, Inc., d/b/a GlobalX*

## INTRODUCTION

This lawsuit tries to hold a private aviation subcontractor liable for the federal government's immigration policy. Plaintiffs are Venezuelan nationals whom the government removed from Texas to El Salvador in March 2025. Plaintiffs' grievances—as their Complaint makes clear—are with the officials who designed that policy, selected them for removal, chose their destination, kept them in custody, and detained them abroad. Defendant GlobalX did none of those things. It had neither responsibility for nor discretion over immigration policy or the removal decisions at issue, nor did it ever maintain custody over Plaintiffs. Pilots and flight attendants do not become immigration judges when they contract with the government to fly planes.

GlobalX is a Florida-based charter operator that acted as a subcontractor to Defendant CSI Aviation, Inc. ("CSI"), which contracted directly with the government to provide removal flights. Under its prime contract, CSI—and, through its subcontract, GlobalX—supplied the aircraft, pilots, flight crew, and support personnel for flights that the government scheduled and directed, while ICE officers retained custody of every passenger. For every flight, the government alone determined the manifest and who boarded or deplaned, placed its own officers aboard to maintain custody, and directed the aircraft to destinations enumerated in the contract.

In other words, Defendants were mere instrumentalities of travel for the government. They had no power to evaluate (or reevaluate) underlying removal decisions, and no discretion to accept or reject passengers, redirect flights to different destinations, or otherwise interfere with the government's operations. And under the prime contract, the government retained sole custody of every individual being removed, at all times. Any attempt to interfere with those official activities or custody of detainees could have exposed Defendants to federal criminal liability.

For these reasons, Plaintiffs' claims fail on the merits. The Supreme Court has repeatedly reaffirmed the core holding of *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 21 (1940),

that "there is no liability on the part of the contractor for executing [the government's] will." Plaintiffs' claims fall squarely within *Yearsley*'s protection because, as the allegations definitively establish, CSI and GlobalX performed a lawful and valid contract exactly as the government directed.

Plaintiffs instead try to manufacture a nefarious civil rights conspiracy out of lawful transportation services, conducted exactly as instructed by the government. But Plaintiffs cannot allege the essential element of a conspiracy: a meeting of the minds to engage in unlawful activity and deprive them of rights. There is not a single direct allegation, or plausible inference, that CSI or GlobalX agreed to or intended to harm Plaintiffs—much less because of their protected status (§ 1985(3)) or to obstruct their access to courts (§ 1985(2)). The only agreements alleged are CSI's contract with the Government and GlobalX's subcontract with CSI, solely to provide aviation services for immigration removals—a lawful activity authorized by Congress. And Plaintiffs' state-law claims fail for similar reasons. The state-law claims against CSI are preempted by federal law under *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988), and, by extension, fail against GlobalX. And there is a complete lack of tortious conduct by GlobalX under applicable state tort law.

Plaintiffs devote most of their Complaint to attacking the government's policies and statements of officials. But those allegations are irrelevant, especially as to any claims against GlobalX. As Plaintiffs allege, GlobalX had no contract with the Government and received its instructions only through CSI. Indeed, Plaintiffs never allege that GlobalX communicated with any government official, much less discussed (directly or implicitly) the deprivation of Plaintiffs' rights. Once immigration officials showed up on the tarmac with individuals in their custody, a flight manifest, and a destination, GlobalX had no role other than to fly as instructed—and the

Complaint alleges no facts suggesting that GlobalX had reason to believe these flights differed from any other ICE removal flight. Plaintiffs' disagreement with immigration policy writ large, or with the legal determinations as to their individual immigration status or removal destination, is not a basis for holding a charter operator liable for flying the routes the government assigned.

In addition to being barred by *Yearsley* and failing to meet the elements of each cause of action, the Complaint suffers from other fatal defects. For one, this Court does not have personal jurisdiction over GlobalX, a Delaware company headquartered in Florida that is alleged to have done nothing in or directed at the District. And this District is not the proper venue. The Supreme Court has held that Alien Enemies Act challenges to these removals belong in habeas in the district of confinement, and this Court has since found the District an improper venue for Federal Tort Claims Act claims arising from the same removals.

For these reasons, and others below, the Complaint must be dismissed.

## STATEMENT OF FACTS

### A. CSI Contracted with the Federal Government for Immigration Removal Flights, and It Subcontracted with GlobalX for Aircraft and Crew

Beginning around 2009–2011, the Obama Administration shifted more long-range and foreign removal flights from government-operated planes to privately owned charter aircraft, managed through ICE Air Operations.[1] The shift was intended to increase efficiency, better handle removal volumes, and limit detention time.[2]

---

[1] *See* U.S. Dep't of Homeland Security, *Fiscal Year 2011 Overview Congressional Justification* 64–65, https://www.ice.gov/doclib/foia/secure_communities/fy2011overviewcongressionaljustification.pdf.

[2] *See* U.S. Dep't of Homeland Security, *Statement of John Morton Assistant Secretary U.S. Immigration and Customs Enforcement Department of Homeland Security Regarding a Hearing on "U.S. Immigration and Customs Enforcement FY2012 Budget Request" before the U.S. House of Representatives Committee on Appropriations Subcommittee on Homeland Security* 10 (March

Under this program, DHS eventually awarded an interim contract in 2024 to Defendant CSI to "provide . . . charter flights to facilitate ICE's Enforcement and Removal Operations of illegal aliens." Compl. ¶ 17. CSI is the prime contractor and "is responsible for the performance of its partners and subcontractors." *Id.* ¶ 18. CSI subcontracted work to Defendant GlobalX, an aviation services company based in Miami, Florida, and incorporated in Delaware. *Id.* ¶¶ 19, 21.

GlobalX is a subcontractor that "provided the aircrafts, pilots, flight crew, and essential flight services." *Id.* It has no direct contractual relationship with ICE or any other federal agency. *See id*. ¶¶ 17, 18, 69–71. Plaintiffs allege that "[a]t all relevant times, GlobalX acted as an agent for CSI" and that its "work flowed through, and existed only by virtue of, CSI's prime contract with ICE." *Id.* ¶ 18. Accordingly, "ICE communicated its requirements—flight taskings, schedules, manifests, and mission details—to CSI, and CSI in turn determined and directed how GlobalX would carry out those requirements." *Id.*

### B. The Federal Government, Not CSI or GlobalX, Controlled Every Decision About Removals and Flights

Under the prime contract between ICE and CSI, the Performance Work Statement ("PWS") places removal operations solely in the hands of ICE—not CSI or GlobalX. It defines ICE as the agency "responsible for the detention, health, welfare, transport, and deportation of aliens in removal proceedings, and those subject to final orders of removal from the United States." PWS § 1.0.[3] The prime contractor's scope was to provide "[c]harter aircraft services" including Daily

---

11, 2011), https://www.ice.gov/doclib/news/library/speeches/031111morton.pdf; U.S. Dep't of Homeland Security, *Written testimony of U.S. Immigration and Customs Enforcement (ICE) Director John Morton for a House Committee on Appropriations, Subcommittee on Homeland Security hearing on The President's Fiscal Year 2013 budget request for ICE* (March 8, 2012), https://www.dhs.gov/archive/news/2012/03/08/written-testimony-us-immigration-and-customs-enforcement-ice-director-house.

[3] The Feb. 2024 Scope of Work is incorporated by reference in Plaintiffs' Complaint. *See* Compl. ¶ 18 n.7 & *passim*; *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015)

Scheduled Large Aircraft (DSLA) and Special High-Risk Charter (SHRC) aircraft necessary "to provide reliable, safe, and secure mass air transportation of aliens in ICE custody." *Id.* § 1.3.

The Government chose the passengers, and it alone determined the legal basis for their removal. The PWS provides that "ICE officer(s) will be responsible for the custody of any alien passengers." *Id.* § 7.1. The Government, not the contractor or subcontractor, ensures that "all passengers to be transported shall have completed security screening and have proper documentation to permit departure to the foreign destination(s)." *Id.* § 8.7. Defendants, therefore, had no discretion over passengers, where the flights went, or why deportees were being removed. *Id.* They did not and could not screen passengers, check identification, or otherwise keep them off flights. Nothing in the PWS authorized the contractor or subcontractor to refuse, cancel, or redirect a government-directed flight. *See id.* §§ 4.3, 8.7. In certain circumstances, doing so could lead to criminal liability for impeding federal officials in the performance of official duties. *See, e.g.*, 18 U.S.C. § 111(a) (making it a crime to "forcibly . . . impede[], intimidate[], or interfere[] with" federal officers and employees "while engaged in or on account of the performance of official duties").

The Government likewise controlled the scheduling of every flight. The PWS specifies that "[t]he U.S. Government will provide flight schedule requirements" and "provide the contractor with a manifest containing the names of all passengers for each flight prior to departure." PWS

("A pleading's reference to even a part of a fully integrated and authentic contract thus incorporates the contract as a whole into the complaint."). GlobalX refers to the Feb. 2025 version of the Performance Work Statement ("PWS"), however, as it was the operative document at the time of the alleged events. *See* Defendant CSI's Motion to Dismiss, Ex. A. The 2025 version is a later iteration of the same integrated document referenced in the Complaint and is integral to Plaintiffs' claims, and the Court may also take judicial notice of it. For purposes of this Motion, there are no material differences between the 2024 and 2025 versions. Accordingly, GlobalX will cite only the relevant provisions from the operative 2025 PWS; but both, along with Plaintiffs' own allegations, require dismissal for the reasons below.

§ 8.7. The Government supplied the schedule requirements "to the contractor no later than 24 hours prior to the initial departure time of a flight." *Id.* § 2.8. And the Government reserved the unilateral right to cancel any planned flight without penalty. *Id.* § 4.3.

That government control extended to destinations. The PWS identified possible flight destinations including, but not limited to, "North America, Central America, South America, the Caribbean, or domestic destinations." *Id.* § 1.1. El Salvador was therefore a permissible destination for ICE charter flights under the PWS.

### C. The Government, Not Defendants, Made the Removal Decisions at Issue

The immigration policy and decision to remove Plaintiffs came from the federal government alone, not CSI or GlobalX. In late February and early March 2025, the federal government announced its intention to remove certain Venezuelan nationals to El Salvador. That decision was made at the highest levels of government and memorialized in a Presidential Proclamation. Compl. ¶¶ 71, 103. Plaintiffs Andry Omar Blanco Bonilla, Wild Yahare Chirinos Romero, and Jerce Egbunik Reyes Barrios are Venezuelan nationals who were transported from Harlingen, Texas, to El Salvador on or about March 15–16, 2025. *Id.* ¶¶ 14–16. Plaintiffs do not allege that GlobalX selected them for removal, exercised custody of them, evaluated the legality of their removal, or controlled the boarding process for their deportation flights. *See id.* ¶ 95; *see also* PWS §§ 7.1, 8.7. On March 15, 2025, ICE officials transported Plaintiffs and other deportees to Harlingen, Texas, and boarded them on GlobalX aircraft. Compl. ¶ 95.

### D. This Court Entered Orders Directed at the Government, Not at Non-Party GlobalX

At 1:00 a.m. on March 15, 2025, a group of plaintiffs filed a putative class action seeking to enjoin the deportation, naming only the federal government as a defendant. *See id.* ¶ 94; *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Mar. 15, 2025). Neither CSI nor GlobalX was a party to the

*J.G.G.* proceedings. *See generally J.G.G.,* No. 1:25-cv-00766. Throughout the day, this Court issued a series of oral and written orders, none of which was directed at or imposed any obligation upon GlobalX, a non-party.

First, at 9:40 a.m., this Court entered an *ex parte* temporary restraining order preventing the government from removing the five named plaintiffs in *J.G.G.*, though relief was not extended to the entire class. Compl. ¶ 96. Plaintiffs do not allege that the order was communicated to GlobalX. They allege instead that some named *J.G.G.* plaintiffs were removed from the flights, but do not allege it was done by GlobalX. *Id.* ¶ 97. According to the federal government, the named plaintiffs were not removed from the plane because they never boarded. *See* Tr. of Show Cause Hearing at 9:22–10:6, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Apr. 4, 2025), ECF No. 76. At 5:26 p.m., the first flight departed Harlingen, and at 5:44 p.m., the second flight departed. Compl. ¶¶ 104–05.

At about 6:45 p.m.—after the first two flights were already airborne—this Court certified a class in *J.G.G.* and prohibited removals under the Proclamation for fourteen days. *Id.* ¶ 106. In an oral order, the Court instructed the Administration's counsel: "You shall inform your clients"—i.e., the federal government—"of this immediately." *Id.* ¶ 107. The Court then issued a further order at 7:26 p.m., directing the "Administration" to "facilitate the return" of individuals being removed. That order, too, was directed only to the Government. Plaintiffs do not allege that this order was served on or communicated to GlobalX. *Cf. id.* ¶ 107 (alleging merely that the orders were "*intended* to be communicated to Defendants" (emphasis added)). Nor does the Complaint

allege that GlobalX or the flight crew independently learned of that written order, issued ten minutes before the final flight took off at 7:36 p.m. *Id.* ¶ 110.[4]

All three flights followed the Government's established routes, landing in Comayagua, Honduras, and then El Salvador. *Id.* ¶ 112. This was consistent with standard ICE Air Operations practices for flights to Central American destinations under the PWS. PWS § 1.1.

### E. Plaintiffs' Central Allegations of Mistreatment Describe Only Alleged Government Conduct, Not GlobalX Conduct

The Complaint's central claims about alleged mistreatment and illicit motive are directed only at the United States and El Salvador governments, and their officials—not GlobalX. *See, e.g.*, Compl. ¶¶ 4–6, 11, 13, 27–63, 86–90, 92, 94–96, 101, 103, 106–07, 127–72.

For example, the Complaint describes several statements by President Trump regarding immigration policy, which Plaintiffs allege amounted to racial animus. *See, e.g.,* Compl. ¶¶ 27–32. Plaintiffs also spend several paragraphs describing mistreatment in the United States and brutal conditions in a Salvadoran prison, *id.* ¶¶ 40–46, but they allege no mistreatment aboard GlobalX planes, where Plaintiffs were solely in government custody.

Nor do Plaintiffs allege that any GlobalX employee mistreated or harmed them. Plaintiffs' sole allegation involving GlobalX staff is that "some GlobalX staff mocked Class Members for being afraid to disembark." Compl. ¶ 122.[5]

---

[4] The Supreme Court later vacated the TROs, holding that challenges to removal under the Alien Enemies Act, 50 U.S.C. § 21, must be brought in habeas in the district of confinement. *Trump v. J.G.G.*, 604 U.S. 670, 671–72 (2025) (per curiam).

[5] GlobalX denies this allegation and would condemn such conduct. But, as explained below, even accepted as true, it is not legally significant. It is not an overt act in furtherance of any conspiracy, and mere insults are not actionable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Restatement (Second) of Torts § 46 cmt. d (1965).

Much of Plaintiffs' Complaint centers on this Court's March 15, 2025 hearings and orders. Compl. ¶¶ 94–112. Plaintiffs describe behind-the-scenes discussions about the Government's alleged noncompliance with those orders, suggesting that this was part of the conspiracy to deprive Plaintiffs of rights. *Id*. But every alleged participant in those communications was a government official or government counsel; none involved GlobalX. *See id.*

**LEGAL STANDARD**

Rule 12(b)(2) of the Federal Rules of Civil Procedure governs motions to dismiss for lack of personal jurisdiction. On a Rule 12(b)(2) motion, the plaintiff bears the burden "to make a prima facie showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017) (quotation omitted). Neither "[c]onclusory statements [nor] bare allegation[s] of conspiracy or agency" satisfy this burden. *Id.* at 57 (quotation omitted). A plaintiff "must allege specific acts connecting each defendant with the forum." *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (cleaned up). "The court need not accept inferences drawn by [the plaintiff] if such inferences are unsupported by the facts set out in the complaint." *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004). "Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.* (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Rule 12(b)(3) of the Federal Rules governs motions to dismiss for improper venue. To succeed on a motion to dismiss for improper venue, the defendant must "present facts that will defeat the plaintiff's assertion of venue." *Darby v. U.S. Dep't of Energy*, 231 F. Supp. 2d 274, 276–77 (D.D.C. 2002) (citations omitted). While "the court accepts the plaintiff's well-pled factual

allegations regarding venue as true" and "draws all reasonable inferences from those allegations in the plaintiff's favor," it "need not accept the plaintiff's legal conclusions as true." *Id.*

Finally, to survive under Rule 12(b)(6), the Complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**SUMMARY OF ARGUMENT**

The Complaint should be dismissed for four reasons.

*First*, the Court lacks personal jurisdiction over GlobalX. GlobalX is not at home in the District, and Plaintiffs do not allege any act by GlobalX in or directed to the District. The Government's presence here cannot be imputed to a subcontractor, whether directly or through a conclusory conspiracy theory.

*Second*, venue is improper. Every event involving GlobalX occurred in Texas or abroad, and the Supreme Court has already held that Alien Enemies Act challenges to these very removals must be brought in habeas in the district of confinement. This Court, too, has held that venue in this District was improper for Federal Tort Claims Act claims against the Government arising from the same removals.

*Third*, the claims all fail on the merits. *Yearsley* bars every claim because the Complaint, on its face, establishes that GlobalX acted under lawful federal authorization and stayed within it at all times. A contractor cannot be held liable for accomplishing exactly what the Government requested. Each claim also fails on its own terms. Plaintiffs plead no agreement, no class-based animus, and no overt act sufficient for their §§ 1985 and 1986 claims. The § 1986 and false imprisonment claims are time-barred on the face of the Complaint. The Alien Tort Statute claim

is an aiding-and-abetting claim that the Supreme Court has foreclosed. And the state-law tort claims fail for want of detention, outrageous conduct, duty, or causation.

*Fourth*, the state law claims against CSI are preempted under *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), which shields government contractors from state tort liability when the United States approved reasonably precise specifications, the contractor conformed to them, and the government was aware of known dangers. In turn, the claims are preempted as to CSI's subcontractor, GlobalX, which Plaintiffs alleged acted as CSI's agent and had all its responsibilities derive solely through CSI. The claims are also preempted by the Airline Deregulation Act, as they seek to penalize an air carrier for the routes it flew and the passengers it carried.

## ARGUMENT

### I. This Court Lacks Personal Jurisdiction over Defendant GlobalX

GlobalX is subject to neither general nor specific personal jurisdiction in this District. As to general jurisdiction, GlobalX is incorporated in Delaware and has its principal place of business in Florida. *See* Compl. ¶ 21; *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." (cleaned up)). And the Complaint alleges no exceptional contacts that would otherwise render GlobalX "essentially at home" in the District. *Id.* at 127.

Nor does specific jurisdiction exist. The plaintiff must establish that specific jurisdiction over a non-resident defendant (1) "comports with the forum's long-arm statute," and (2) "does not violate due process." *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094–95 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

Plaintiffs do not allege any facts that trigger D.C.'s long-arm statute, which requires that their claims "arise[] from" one of seven enumerated activities by the defendant. D.C. Code Ann. § 13-423(a). None applies. GlobalX does not "contract[] to supply services in the District of Columbia." *Id.* § 13-423(a)(2). The flights at issue flew from Texas to El Salvador, and Plaintiffs do not allege that GlobalX performed flight services other than out of Texas, Louisiana, or Arizona, as outlined in the PWS. PWS § 1.1. Nor did any of GlobalX's alleged tortious acts occur in the District or cause injury there. D.C. Code Ann. § 13-423(a)(3)–(4). Plaintiffs are Venezuelan nationals who never resided in the District. Compl. ¶¶ 14–16. They never entered the District during the events alleged in the Complaint, and any harm they allegedly suffered occurred entirely outside the District (and largely outside the country), en route from Texas to El Salvador and in Salvadoran custody.

The only other provision in D.C.'s long-arm statute that could arguably apply is the transacting-business provision, which authorizes jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." D.C. Code Ann. § 13-423(a)(1). Because that provision is coextensive with the Due Process Clause of the Fifth Amendment, the two inquiries merge. *Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 395–96 (D.C. Cir. 2024). And Plaintiffs are limited to "claim[s] for relief arising from acts enumerated in" the long-arm statute. D.C. Code Ann. § 13-423(b).

The transacting-business provision does not apply here. GlobalX did not transact any business in the District, and the fact that it is a subcontractor on a federal contract does not bring its conduct within this clause. *United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995) ("[C]ontact with a federal instrumentality located in the District will not give rise to personal jurisdiction."). The Complaint does not allege that GlobalX negotiated or executed any contract in

the District. Again, CSI—not GlobalX—entered the prime contract with the federal government. Nor does Plaintiffs' allegation that GlobalX acted as CSI's agent, Compl. ¶ 18, change the analysis. The Complaint does not allege that CSI transacted business in the District on GlobalX's behalf.

Lacking a foothold in any provision of the long-arm statute, Plaintiffs may attempt to rest on a conspiracy theory of jurisdiction. *See* Compl. ¶ 24 (alluding to conspiracy jurisdiction). Although the transacting-business provision has been applied to alleged civil conspiracies—*see, e.g.*, *Second Amend. Found.*, 274 F.3d at 523 ("Persons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.'" (quoting D.C. Code Ann. § 13-423(a)(1)))—courts have significantly circumscribed this theory of jurisdiction to comply with due process. *See FC Inv. Grp. LC*, 529 F.3d at 1097–98; *Companhia Brasileira Carbureto de Calcio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 372 (D.C. Cir. 2011) (plaintiff must "plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy" (internal quotation marks omitted)).

To establish jurisdiction on this theory, the plaintiff must make a prima facie showing of civil conspiracy under D.C. law. *Second Amend. Found.*, 274 F.3d at 523–24. That requires alleging:

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Id.* at 524. The pleading bar is high. Bare allegations of conspiracy will not suffice; rather, the plaintiff must show specific acts connecting the defendant to the forum. *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C. Cir. 1988). The alleged conspiracy and the overt acts within the forum must be pleaded with particularity. *See FC Inv. Grp. LC*, 529 F.3d at 1097. And

after *Walden v. Fiore*, 571 U.S. 277 (2014), a plaintiff seeking to attribute a co-conspirator's forum contacts to a nonresident defendant must plead that the defendant knew the co-conspirator was carrying out acts in the forum. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 91 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 186 (D.D.C. 2018).

Plaintiffs' conspiracy theory runs headlong into two dispositive hurdles. First, the Complaint alleges no direct contact at all between GlobalX and the government. *See generally* Compl.; *id.* ¶ 18. Nor does it allege that GlobalX knew that any co-conspirator was acting in the District, as *Walden* requires. Second, as explained *infra* Part III.B, Plaintiffs fail to allege a conspiracy—defeating their claims on the merits but also depriving this Court of jurisdiction.

Because there is no jurisdiction under the long-arm statute, the Court need not go further. Still, for the same reasons the statute does not apply, Plaintiffs cannot establish the "minimum contacts" that due process requires. Plaintiffs do not allege *any* GlobalX contacts with the forum, much less contacts connected to their claims. *See Walden*, 571 U.S. at 284–86 (relevant contacts are those the defendant itself creates with the forum, not the contacts of the plaintiff or third parties); *see also Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262–65 (2017); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359–62 (2021). GlobalX does not do business in the forum, has not reached out to the forum, and performed none of the acts giving rise to this suit in the forum. The Complaint alleges no communication between GlobalX and anyone in the District. Any government communications ran only to CSI. Compl. ¶ 18.

Plaintiffs may argue that GlobalX's participation in a nationwide federal program, administered from Washington, suffices for personal jurisdiction. It does not. The "unilateral activity" of a third party—here, the Government's decision-making in the District—"cannot

satisfy the requirement of contact with the forum State." *Walden*, 571 U.S. at 284, 291. A contrary rule would subject every contractor that performs any federal work anywhere to suit in this District. Accordingly, haling a government subcontractor that has no minimum contacts with the forum into court in the District would "offend 'traditional notions of fair play and substantial justice'" and violate GlobalX's due-process rights. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

## II. Venue Is Improper in the District of Columbia

The Court should also dismiss this case because the District of Columbia is not a proper venue. Plaintiffs invoke 28 U.S.C. § 1391(b)(2), alleging that "a substantial part of the events or omissions giving rise to the claim occurred" in D.C. Compl. ¶ 25. That is wrong. The Complaint itself makes clear that all events that form the basis of the claims against GlobalX took place outside the District. *See Lamont v. Haig*, 590 F.2d 1124, 1134 (D.C. Cir. 1978) (venue turns on events having a substantial connection to the claim). The Complaint does not allege that the subcontract between GlobalX and CSI—the only relationship tying GlobalX to the alleged conspiracy—was negotiated, executed, or performed in the District. And every act attributed to GlobalX occurred on the flights from Texas to Honduras to El Salvador. Thus, none—let alone "a substantial part"—of the "events or omissions giving rise to the claim[s]" against GlobalX occurred in this District.

The Supreme Court's treatment of the same removals points in the same direction. In vacating this Court's temporary restraining orders arising from the same March 2025 removals, the Court held that detainees' challenges to removal under the Alien Enemies Act must be brought in habeas in the district of confinement—here, Texas—not in the District of Columbia. *Trump v. J.G.G.*, 604 U.S. 670, 671–72 (2025) (per curiam). Although that holding concerned the proper

vehicle and forum for challenges to removal, it confirms that the operative events occurred where Plaintiffs were confined and removed. If the Government's own conduct must be challenged in Texas, the claims against a Florida-based flight subcontractor whose only alleged conduct occurred in Texas and abroad have even less connection to this District.

Nor can Plaintiffs manufacture venue from the *J.G.G.* proceedings themselves. Compl. ¶¶ 91–116. That this Court issued orders to the Government does not make the District the place where the conduct giving rise to the claims against GlobalX occurred—particularly where GlobalX was not a party to the *J.G.G.* proceedings and the orders were not directed to it. The venue inquiry focuses on the events giving rise to the claims, and the claims against GlobalX arise solely from flight operations in Texas and abroad. A court's issuance of an order in a separate case is not an "event or omission" of the defendant. If it were, any plaintiff could establish venue simply by first litigating against a different party in the forum of choice.

This Court recently reached a similar conclusion in a case arising from the same removals. *See Rengel v. United States*, No. 26-cv-1008 (JEB), 2026 WL 2224815 (D.D.C. Aug. 3, 2026) (Boasberg, J.) (finding the District an improper venue for claims against the Government arising from the same removals). Although *Rengel* applied the Federal Tort Claims Act's venue provision, its reasoning applies with even greater force here. If venue was improper even for claims against the Government itself, venue is all the more improper for claims against a private subcontractor whose alleged conduct has no tie to the District at all.

Dismissal, not transfer, is the proper remedy. Transfer under 28 U.S.C. § 1406(a) is not "in the interest of justice" where the complaint presents obvious "substantive problems," *Buchanan v. Manley*, 145 F.3d 386, 389 n.6 (D.C. Cir. 1998), or "the outcome is foreordained," *Simpkins v.*

*District of Columbia Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997). As explained *infra* Part III, the claims against GlobalX fail as a matter of law. Dismissal is therefore the appropriate remedy.

## III. Plaintiffs' Claims Against GlobalX Fail on the Merits

### A. Under *Yearsley*, GlobalX Cannot Be Liable for Providing Lawful Services to the Government, Exactly as Requested

In *Yearsley*, 309 U.S. 18, landowners sued a contractor for erosion caused by its performance of a government contract to build dikes. *Id*. at 19. The Supreme Court held that there can be "no liability on the part of [a] contractor for executing [the government's] will," so long as (1) the contractor's authority was validly conferred by the government, and (2) the contractor did not exceed that authority. *Id*. at 20–21.

Last Term, the Supreme Court twice reaffirmed the core holding of *Yearsley*—that it "provides protection to a contractor when it has received a lawful authorization and acted according to its terms—meaning, when the contractor has acted within legal bounds." *GEO Grp., Inc. v. Menocal*, 607 U.S. 438, 449 (2026); *Hencely v. Fluor Corp.*, 608 U.S. 31, 48 (2026); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–67 (2016). In *GEO Group*, the Court explained that *Yearsley* is a merits defense rather than transferred governmental immunity, but it made clear that a government contractor can be liable *only if* it "either acted under an illegal authorization or exceeded the scope of a legal one." *GEO Grp.*, 607 U.S. at 449. And while the Court in *Hencely* declined to apply *Yearsley*, that was only because the contractor in that case was "alleged to have acted outside the authority the military granted it." *Hencely*, 608 U.S. at 48. The Court reaffirmed that a contractor cannot be "sued precisely for accomplishing what the Federal Government requested." *Id.*

Plaintiffs' claims fall squarely within *Yearsley* and should be dismissed on the pleadings. *See Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017) (*Yearsley* can defeat

claims against contractor at pleading stage based on incorporated-by-reference government contract). Plaintiffs do not allege an illegal authorization or conduct outside the scope of GlobalX's authority. To the contrary, they allege Defendants should have *contravened* Government orders by "alter[ing] the planes' course" or having the pilot "cancel[] or redispatch[]" the flight, Compl. ¶¶ 108, 115–16, conceding that CSI—and, by extension, GlobalX—"accomplish[ed] what the Federal Government requested." *Hencely*, 608 U.S. at 48. Whatever basis Plaintiffs may have to challenge the Government's underlying removal decisions, they cannot sue the contractors that provided transportation exactly as requested.

**1. CSI's and GlobalX's Authority Was Validly Conferred**

Plaintiffs do not allege that Congress lacked constitutional authority to permit contracts for chartered removal flights. Nor could they. The government has long engaged private contractors to perform detention and transportation functions. *See, e.g.*, *GEO Grp.,* 607 U.S. at 445; *United States v. King Cnty.*, 122 F.4th 740, 747 (9th Cir. 2024). And this particular program—ICE Air Operations—has used air charter services for roughly twenty years. *See United States v. King Cnty.*, 666 F. Supp. 3d 1134, 1141 (W.D. Wash. 2023) (explaining that the program has transferred or removed many noncitizens using air charter services since 2006), *aff'd*, 122 F.4th 740 (9th Cir. 2024).

Moreover, the relevant question at this step of the inquiry is not whether any particular removal decision was lawful, as Plaintiffs may suggest, but whether the government had the authority to engage a contractor to perform the task at all. *See Yearsley*, 309 U.S. at 20–21 ("[A]uthority to carry out the project was validly conferred . . . if what was done was within the constitutional power of Congress."); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648 (4th Cir. 2018) ("The question is not whether [the contractor's conduct] violated the

[statute], but rather whether Congress had the authority to assign [the contractor] to complete that task."). Accordingly, any allegation that the *government* failed to afford Plaintiffs due process or deprived them of another federal right during the underlying immigration proceeding is irrelevant. GlobalX had no role in those proceedings and no authority or discretion to adjudicate immigration status or to determine removal destination. GlobalX's subcontractual role was solely to transport individuals whom the government had already deemed removable.

Correctly framed, there can be no dispute under this prong that Congress authorized the Executive to contract for air transportation of noncitizens in federal custody. The Homeland Security Act transferred the immigration enforcement functions of the former Immigration and Naturalization Service to the Department of Homeland Security. *See* 6 U.S.C. §§ 111, 202, 251, 557. Part of that authority includes enforcement of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq*. The INA gives the Secretary of Homeland Security responsibility for administering and enforcing the immigration laws. *Id.* § 1103(a)(1). It also authorizes the Secretary to issue regulations, delegate authority to DHS officers and employees, and spend money on the care and custody of detained noncitizens. *Id.* § 1103(a)(1), (a)(3), (a)(4), (a)(11).

Congress has directed that noncitizens ordered removed be detained and removed. *Id.* § 1231(a). It has also directed DHS to "arrange for appropriate places of detention" pending removal, including through facilities and services obtained by contract. *Id.* § 1231(g). The INA separately addresses the costs and logistics of transporting noncitizens being removed. *Id.* § 1231(c)–(e). DHS has delegated that authority to ICE. *See* 8 C.F.R. §§ 2.1, 100.1. Both ICE and DHS have authority to contract with private companies to carry out their statutory and regulatory missions. *See, e.g.*, 41 U.S.C. subtit. I, div. C. Thus, ICE and DHS may contract with private air carriers and service providers to carry out removal and transfer flights. *Cf. GEO Grp., Inc. v. Newsom*, 50 F.4th

745, 751 (9th Cir. 2022) (en banc) (Congress gave government discretion "to use private contractors to run its immigration detention facilities"). Congress also has repeatedly funded these operations through ICE's annual "Operations and Support" appropriations. *See, e.g.*, U.S. Dep't of Homeland Security, *U.S. Immigration and Customs Enforcement Budget Overview Fiscal Year 2025 Congressional Justification* 41–42, 242–46 (2024).[6]

**2. GlobalX Acted Within the Scope of Authority and Had No Discretion Over the Removal Decisions**

Plaintiffs do not allege that CSI or GlobalX exceeded the scope of their lawful authority. To the contrary, the Complaint's own allegations establish that CSI—and by extension, its subcontractor, GlobalX—performed precisely the services contemplated by the PWS. *See Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021) ("The appropriate inquiry is whether [the contractor] adhered to the Government's instructions as described in the contract documents.").

First, Plaintiffs allege that GlobalX operated charter flights to destinations directed by the government (including Central America), which was an enumerated DSLA destination, and did so on schedules furnished by Government Contracting Officer Representatives. *Compare* Compl. ¶¶ 3–4, 102, *with* PWS § 1.1 ("[D]aily scheduled flights to include, but not limited to: . . . Central America . . . ."), *and id.* § 2.8 ("To facilitate flight planning, schedule requirements will usually be provided to the contractor [by the Government] no later than 24 hours prior to the initial departure time of a flight.").

[6] *See, e.g.*, U.S. Dep't of Homeland Security, *U.S. Immigration and Customs Enforcement Budget Overview Fiscal Year 2025 Congressional Justification* 41–42, 242–46, https://www.dhs.gov/sites/default/files/2024-04/2024_0308_us_immigration_and_customs_enforcement.pdf.

Second, Plaintiffs allege that GlobalX carried passengers identified and screened by ICE, and that ICE officers maintained custody of all passengers at all times. *Compare* Compl. ¶ 18, *with* PWS § 7.1 ("ICE Officer(s) will be responsible for the custody of any alien passengers."), *and id.* § 8.7 ("The U.S. Government will ensure that all passengers to be transported shall have completed security screening and have proper documentation to permit departure to the foreign destination(s)[;] [o]nboard U.S. Government officials will be responsible for all direct liaison and discussion with foreign government officials regarding passenger immigration and the reasons for their transport[;] and . . . will provide flight schedule requirements.").

In short, the Complaint makes clear that CSI, and by extension GlobalX, performed *exactly* as required, and had no discretion to determine who boarded or deplaned, or where the flights went. Nothing in the Complaint suggests that GlobalX remotely deviated from these contractual terms or explicit instructions, or that it undertook any action outside the scope of the authority conferred.

Plaintiffs may suggest that documents incorporated by reference into a complaint cannot be accepted for the truth of the matters asserted in them. *See Banneker Ventures,* 798 F.3d at 1133 (not all facts in a document incorporated by reference are deemed true). But, as the court in *Taylor Energy Co.* explained, the *Yearsley* inquiry looks at whether the contractor "adhered to the Government's instructions as described in the contract documents." 3 F.4th at 176. More fundamentally, the fatal problem for Plaintiffs is that they do not allege any *other* instructions—beyond those in the PWS—that CSI or GlobalX could have deviated from or did deviate from. Their own allegations show that the contractors performed exactly as asked. For that reason, Plaintiffs fail to plausibly allege any claim against GlobalX that survives *Yearsley.*

### 3. Plaintiffs' Challenges to the Underlying Removal Decisions, Immigration Policy, or Government Response to This Court's Orders Do Not Affect Defendants' Liability

Plaintiffs may also respond that the authorization was itself illegal because the Government's underlying removal decisions were later challenged, or because flights continued after this Court's orders. Both arguments fail.

As to the first, the *Yearsley* inquiry asks whether the contractor's authorization was lawful and whether the contractor acted within it—not whether every discretionary decision the Government made in directing performance was lawful. As the Fourth Circuit explained, because the doctrine exists to shield a contractor from liability for an alleged violation of law, an alleged violation of law cannot by itself defeat it—otherwise the defense would disappear in every case in which it matters. *Cunningham*, 888 F.3d at 648–49. In *Cunningham*, plaintiffs alleged that a contractor violated a federal statute while placing calls at the government's direction; the court held that the relevant question was whether the government had authority to assign the contractor that task and whether the contractor followed the government's instructions—not whether the instructed conduct was itself alleged to be unlawful. *Id.* at 649.

In other words, to avoid liability, a contractor is not required to adjudicate the legality of the government's immigration policy before flying an ICE-scheduled mission. GlobalX had no access to the removal determinations, no role in the immigration proceedings, and no authority to second-guess the government's designation of passengers or destinations. PWS §§ 7.1, 8.7. If a later challenge to the government's underlying decisions were enough to strip a contractor of *Yearsley*'s protection, every contractor would bear the legal risk of every policy it implements, and the doctrine would protect no one. Under *Yearsley*, the relevant question is whether the authority conferred is lawful, not whether the underlying government policy or its discretionary decisions are lawful. *Cf. Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)

(applying *Yearsley* and dismissing where allegations attack "Congress's policy of creating and maintaining the MRGO, not any separate act of negligence by the Contractor Defendants.").

As to the second point about court orders, those were directed to the Government, not GlobalX, and the Complaint does not allege that GlobalX ever received them. *See infra* Part III.B.1. A non-party without actual notice of an order cannot be said to have exceeded its authority by failing to obey it. *See* Fed. R. Civ. P. 65(d)(2). Thus, cases like *Hencely* do not help Plaintiffs. There, the contractor's alleged negligence fell outside what the Government had requested, whereas here, the Complaint alleges only that GlobalX did exactly what the Government requested. *Hencely*, 608 U.S. at 48.

The upshot of Plaintiffs' theory here would be that private parties performing federal work must either independently police the legality of federal decisions in real time—at the risk of criminal liability for impeding federal officers, *see* 18 U.S.C. § 111—or face tort liability for doing what the Government directed. Given the scale of federal work performed by contractors, such a rule would allow plaintiffs to attack federal policy through suits against the contractors that carry it out. *Yearsley* exists to prevent plaintiffs from exploiting tort law to deter or interfere with government policy by attacking compliant contractors. *See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (noting that "the driving purpose" of *Yearsley* "is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability." (citation omitted)).

### B. Plaintiffs Do Not Allege a Civil Rights Conspiracy under § 1985

#### 1. Plaintiffs Do Not Allege a § 1985 Conspiracy

While *Yearsley* alone warrants dismissal, Plaintiffs' claims still fail because they do not allege that GlobalX engaged in a conspiracy to unlawfully deprive them of any rights—either

access to the courts (§ 1985(2)) or equal protection of the laws (§ 1985(3)). That fundamental failure defeats these claims.

To state a § 1985 claim, Plaintiffs must first allege the elements of civil conspiracy, meaning "an agreement to take part in an unlawful action or a lawful action in an unlawful manner." *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004); *Second Amend. Found.*, 274 F.3d at 524. Allegations of conduct "just as much in line with" lawful, independent action as with an agreement do not plausibly suggest a conspiracy. *Twombly*, 550 U.S. at 554–57. And merely repeating the word "conspire" does not suffice: "A plaintiff must set forth more than just conclusory allegations of an agreement to sustain a claim of conspiracy against a motion to dismiss." *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004).

Here, Plaintiffs repeat the word "conspiracy" but allege no facts suggesting an agreement among GlobalX, CSI, and the Government to engage in any unlawful activity. The *only* relationships Plaintiffs allege are a lawful government contract and subcontract—CSI's contract with the Government and, in turn, GlobalX's subcontract with CSI. As shown *supra* Part III.A, performance of that contract within its terms is not actionable. Beyond that lawful performance, Plaintiffs do not and cannot allege any discussions, meetings, emails, calls, or other indicia of a shared goal of illegal activity. That defeats all of their conspiracy claims.

In addition to the absence of facts establishing a conspiracy among the Government and Defendants collectively, the conspiracy claims against GlobalX, specifically, are precluded by Plaintiffs' own allegations. Plaintiffs allege that all Government requirements flowed to CSI, which "determined and directed" how GlobalX would perform. Compl. ¶¶ 17, 18, 69–71. Consistent with that allegation, there is not a single allegation that a GlobalX officer or employee communicated with any government decisionmaker, much less about unlawfully depriving

Plaintiffs of constitutional rights. *See generally* Compl. Accordingly, Plaintiffs have not plausibly alleged that GlobalX conspired with the Government, and there is no allegation of any intent to join a conspiracy.

Plaintiffs insinuate that, by virtue of its relationship with government officials, CSI knew of and agreed to participate in the government's unlawful activity. GlobalX disagrees, for all the reasons above and in Defendant CSI's motion. A preexisting relationship or communications with government officials does not establish intent to participate in a conspiracy, and inferring such intent from those facts alone is pure speculation. *See Murray v. Shaw*, No. 24-CV-00640 (APM), 2025 WL 915752, at *29 (D.D.C. Mar. 26, 2025) (Mehta, J.) (dismissing conspiracy claim where plaintiff alleged "certain interactions among these Defendants, but they rest largely on their interpersonal relationships," and noting these were insufficient, conclusory allegations); *see also In re Generic Pharm. Pricing Antitrust Litig.*, 386 F. Supp. 3d 477, 485–86 (E.D. Pa. 2019) (mere relationship alone is insufficient to allege conspiracy). And, in turn, even a plausible conspiracy between CSI and the Government (of which there is none) does not and cannot extend to GlobalX merely by virtue of its being a subcontractor. *Cf. Brownstone Inv. Grp., LLC v. Levey*, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007) (conspiracy charge among co-principals of a business dismissed as conclusory); *Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC,* No. 03 Civ. 9471 (CSH), 2004 WL 1574645 (S.D.N.Y. July 13, 2004) (conspiracy charge among companies partially held by the same owners and located at same address was dismissed as conclusory).

Lacking direct or plausible circumstantial allegations of a civil-rights conspiracy, Plaintiffs seem to treat innocuous facts as indirect evidence of unlawful conduct or motive. But speculation and insinuation cannot substitute for facts showing an agreement to violate civil rights.

For example, Plaintiffs point to GlobalX's increased revenues from 2023 to 2024 after it received the subcontract award from CSI, Compl. ¶¶ 176–77, and to the fact that it chartered multiple planes rather than one, *id.* ¶¶ 73–74. Those allegations show only that GlobalX grew its revenue and capacity, not that it joined a civil-rights conspiracy with its contractual counterparties. *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1348 (11th Cir. 2025) ("Among plausible alternatives, Savencia Cheese, as a distributor to Schratter, could have signed the agreement for a lawful purpose: to increase profits. This lawful rationale would serve as another justification for execution of the agreement."). Further, the revenue growth Plaintiffs cite occurred in 2023 and 2024—well before the March 2025 events that form the basis of the alleged conspiracy—and so cannot evidence an agreement concerning them. And the PWS expressly provided for surge capacity, authorizing the contractor to increase the number of aircraft supporting DSLA flights to 12 or more. PWS § 2.1. A business that profits from a lawful government contract is not, simply for that reason, a co-conspirator in unlawful activity.

Plaintiffs also claim that GlobalX "began obfuscating its work for ICE, now using dummy call signs and hiding its planes' tail numbers from tracking websites." Compl. ¶ 178. Out of context, that conduct may sound nefarious. But in aviation, this is lawful activity under FAA programs, of which the Court may take judicial notice: "To address privacy concerns, the FAA offers the Privacy International Civil Aviation Organization (ICAO) Address (PIA) program to improve the privacy of . . . eligible aircraft . . . ."[7] Once approved for the program, an aircraft broadcasts the FAA-assigned temporary call sign rather than its N-number (i.e., a "dummy call

[7] Fed. Aviation Admin., *ADS-B Privacy* (last visited Oct. 27, 2026), https://www.faa.gov/air_traffic/technology/equipadsb/privacy; *see Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022) ("The Court may take judicial notice of information posted on official public websites of government agencies.").

sign"). The operator maintains privacy in ATC communications, though the FAA can still identify the aircraft when necessary for security-related requests from the Department of Defense, Department of Homeland Security, or law enforcement.[8]

Moreover, Plaintiffs allege that GlobalX "now" uses these call signs, Compl. ¶ 178—that is, after the March 2025 flights. Conduct postdating the alleged conspiracy cannot show an agreement to join it.

Nor can Plaintiffs' allegations concerning the Court's orders support an inference of conspiratorial intent. The Complaint does not allege that GlobalX had actual knowledge of this Court's orders. It alleges only that the orders were "clearly intended to be communicated to Defendants," not that they ever were. Compl. ¶ 107. Mere intent to communicate does not establish actual notice. And a non-party is bound by an injunction only if it receives "actual notice" of it. Fed. R. Civ. P. 65(d)(2). The absence of actual knowledge negates any inference that GlobalX acted with conspiratorial intent to defy the Court's orders.

Plaintiffs may contend that the timing of the final flight—departing shortly after the Court's 7:26 p.m. order—itself suggests coordinated defiance. But the Complaint alleges no facts showing that anyone conveyed that order to GlobalX or its crew in the ten minutes before departure, and the flights operated on schedules and routing set by the Government. Conduct that is equally consistent with ordinary performance of a government-scheduled flight does not plausibly suggest an unlawful agreement. *Twombly*, 550 U.S. at 554–57.

Because Plaintiffs fail to plead the threshold element of an agreement, the Court need not reach the remaining elements of a § 1985 claim. Even if it does, those claims independently fail for the reasons set forth below.

---

[8] Fed. Aviation Admin., *ADS-B Privacy*.

### 2. Plaintiffs Do Not Allege GlobalX Had Intentional Racial Animus

In addition to failing to plead conspiracy, Plaintiffs fail to plausibly allege that GlobalX agreed specifically to deprive them of their rights based on race or protected status. *See Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). Section 1985(3) requires class-based, invidiously discriminatory animus behind the alleged conspiracy. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993); *see also United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 833 (1983); *Johnson v. Georgetown Univ.*, 827 F. Supp. 3d 133, 171 (D.D.C. 2026) (Cooper, J.) ("It is not enough that the defendants conspired to interfere with [Plaintiff's] rights; they must also have been motivated by invidious discrimination." (citing *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987))).

Plaintiffs allege no facts showing that GlobalX was motivated by racial animus, nor do they allege any plausible reason it would be. The Complaint describes GlobalX only as a charter operator performing flights under a subcontract, Compl. ¶¶ 18–21, and Plaintiffs never suggest that it harbored invidious discrimination of any sort. Plaintiffs cannot merely claim, without any factual basis, that a successful aviation company is racist or discriminatory because it subcontracts for a government contractor, which in turn contracts with the government. Plaintiffs do not include a single factual allegation supporting that key element of their claim. Every statement concerning race or nationality in the Complaint is attributed only to others—not to GlobalX, *see* Compl. ¶¶ 26–34—and there is not one allegation that GlobalX knew of those statements, agreed with them, or adopted them. *See, e.g.*, *id.* (alleging statements that show "the *[Trump] Administration's* . . . animus against Latin American and Venezuelan migrants").

### 3. Plaintiffs Do Not Allege GlobalX Intended to Deter Access to Courts

To the extent Plaintiffs proceed under the first clause of § 1985(2), which does not require class-based animus, *see Kush v. Rutledge*, 460 U.S. 719, 726 (1983), that claim fails for a different reason. That clause reaches conspiracies to deter, "by force, intimidation, or threat," a party or witness from attending or testifying in federal court. 42 U.S.C. § 1985(2); *see also Vindman v. Trump*, No. 22-cv-257 (JEB), 2022 WL 16758575, at *6 (D.D.C. Nov. 8, 2022) (Boasberg, J.) (dismissing this claim where the complaint's "facts do not plausibly suggest that Defendants agreed to intimidate him so as to prevent him from testifying"). The Complaint alleges no force, intimidation, or threat by GlobalX directed at any party or witness in the *J.G.G.* proceedings. Nor does it plausibly allege that GlobalX even knew of the proceedings and agreed to obstruct them. *See* Compl. ¶¶ 190–99; *see also* Resp. to Order to Show Cause at 4, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Mar. 25, 2025), ECF No. 58 ("[T]he Government did not order any removal flights to return to the United States."). Indeed, most of the alleged conduct precedes the *J.G.G.* proceedings, *see* 42 U.S.C. § 1985(2) (requiring a matter to be "pending" in federal court), and involves lawful conduct under a contract that is "equally well explained by legitimate economic incentives." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012). Such allegations do not suffice to transform innocuous contractual performance into a nefarious conspiracy subject to liability under § 1985(2). *See id.* at 1052.

**4. Plaintiffs Do Not Allege Other Elements of § 1985**

Even if Plaintiffs could somehow establish a conspiracy and racial animus or intent to deprive access to courts, their § 1985 claims independently fail because the Complaint does not adequately plead the remaining elements. A § 1985 claim requires an act in furtherance of the conspiracy and an injury caused by that act. *See Atherton*, 567 F.3d at 688; *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The overt act must be performed pursuant to and in furtherance

of the common scheme; the mere existence of a relationship with another alleged conspirator is not enough. *See Halberstam*, 705 F.2d at 477.

The Complaint alleges no injury caused by an overt act performed by GlobalX in furtherance of a conspiracy. GlobalX merely operated flights as directed under its subcontract with CSI. It had no role in the determinations that Plaintiffs were removable, in the designation of their destination or hand-off to foreign officials, or in the *J.G.G.* proceedings, to which it was not a party. *See* PWS §§ 7.1, 8.7; Compl. ¶¶ 18, 94–112. The flights at issue traveled to destinations expressly enumerated in the PWS and followed schedules provided by the Government. GlobalX's role as an instrumentality or conduit of travel did not cause Plaintiffs' injuries, just as a vehicle manufacturer could not be liable for selling the government the trucks used to transport Plaintiffs from the detention facility to the tarmac.

### C. The § 1986 Claim Falls with the § 1985 Claims and Is Untimely

Section 1986 provides a derivative claim that depends on the existence of a conspiracy under § 1985. *Bowie v. Maddox*, 642 F.3d 1122, 1128 (D.C. Cir. 2011). Because Plaintiffs have not adequately pleaded a § 1985 claim, their § 1986 claim necessarily fails.

In any event, § 1986 requires knowledge that the wrongs conspired to be done were about to be committed and the power to prevent or aid in preventing them. 42 U.S.C. § 1986. The Complaint does not allege that GlobalX knew of any conspiracy or had the power to prevent the Government's decisions concerning removal, destination, or custody.

The § 1986 claim is also time-barred. Section 1986 provides that "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." 42 U.S.C. § 1986. Any claim against GlobalX accrued when the flights occurred on March 15–16, 2025—the only conduct in which GlobalX is alleged to have participated. The Complaint was not filed until July 17, 2026, more than sixteen months later, and

its untimeliness is apparent on its face. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Plaintiffs cannot avoid the limitations bar by recasting the alleged injury as arising later from the Government's or El Salvador's subsequent conduct, in which GlobalX played no part.

**D. Plaintiffs Do Not Allege a Violation of the Alien Tort Statute**

Plaintiffs' claim under the Alien Tort Statute, 28 U.S.C. § 1350, based on alleged violations of safe conducts, fails for at least three independent reasons.

First, Plaintiffs do not allege that GlobalX violated any safe conduct. Safe conduct is a privilege granted by a belligerent allowing safe passage. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 723–24 (2004); *Taveras v. Taveraz*, 477 F.3d 767, 773 (6th Cir. 2007). Plaintiffs do not allege that they were granted safe conduct, let alone that GlobalX violated it. To the contrary, Plaintiffs were in federal custody at all times and subject to removal; they were not traveling under a safe conduct. The ATS claim therefore fails at the outset.

Second, Plaintiffs' repackaged aiding-and-abetting torture claim states no cognizable cause of action. A month before the Complaint was filed, the Supreme Court "close[d] the door that *Sosa* cracked to judicially created ATS liability" and held that no cause of action exists under the ATS for aiding-and-abetting liability. *Cisco Sys., Inc. v. Doe I*, 609 U.S. 141, 155–56 (2026). After *Cisco*, only the three historical paradigms remain actionable under the ATS: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *See id.* at 148, 155–56. Plaintiffs' attempt to make an end-run around *Cisco* by rebranding their aiding-and-abetting torture claim as a safe-conducts claim is unavailing. *Cf. Al Shimari v. CACI Premier Tech.*, No. 25-1043, 2026 WL 2547096, at *1–2 (4th Cir. Aug. 28, 2026) (Quattlebaum, J., concurring) (rejecting plaintiffs' attempt after *Cisco* to recast conspiracy to commit torture and cruel, inhuman, and degrading treatment as a piracy claim).

Here, Plaintiffs' central allegation is that CSI and GlobalX "participated in, conspired in, recklessly disregarded, and/or aided and abetted the violations of safe conducts" to "forcibly render Plaintiffs and the Class to El Salvador for confinement at CECOT, where they were held *incommunicado* in barbaric conditions and physically and psychologically tortured." Compl. ¶ 219 (emphasis in original). Stripped of empty labels, that allegation is precisely the secondary-liability theory *Cisco* rejected: the injury is torture by a foreign sovereign, and GlobalX's alleged role is assisting it. The Court should neither reward this creative pleading nor expand the safe-conducts paradigm to absorb aiding-and-abetting liability. Either course would contradict Supreme Court precedent.

Third, the ATS does not apply extraterritorially. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124–25 (2013); *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 633–34 (2021) (plaintiffs must allege domestic conduct relevant to the statute's focus; general corporate activity in the United States is insufficient). Although the flights departed from Harlingen, Texas, and arrived in Honduras and El Salvador, the relevant alleged violations and injuries occurred outside the United States.

To the extent Plaintiffs allege violations of safe conducts, those alleged violations occurred outside U.S. territory, and GlobalX's only domestic conduct—ordinary flight operations—is not conduct relevant to any safe-conduct violation. And even if the claims touch and concern the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. *Kiobel*, 569 U.S. at 124–25.

### E. Plaintiffs' State-Law Tort Claims Each Fail on the Merits

For each of their state-law tort claims, Plaintiffs appear to rely on D.C. law. But although D.C. law governs procedural issues in this forum, D.C.'s choice-of-law analysis points to Texas law on substantive issues. *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir.

2009) (explaining that D.C. choice-of-law analysis blends a governmental-interests analysis with the most-significant-relationship test). For the reasons discussed in the personal-jurisdiction and venue analysis above, Texas—where Plaintiffs boarded the flights and where all of GlobalX's alleged domestic conduct occurred—has the most significant relationship to these claims, and its policy interests would be most advanced by application of its law.

In any event, GlobalX addresses each claim under both Texas and D.C. law for purposes of this motion, without conceding that D.C. law governs, because Plaintiffs' state-law tort claims fail under either body of law, and the two largely mirror each other.

### 1. Plaintiffs Do Not Allege False Imprisonment

A federal court hearing state-law claims applies state substantive law, and for *Erie* purposes, the statute of limitations is a substantive matter. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1457–58 (D.C. Cir. 1995). When multiple jurisdictions' laws are potentially in play, the federal court applies the choice-of-law rules of the forum. *Id.* Here, the Court applies D.C. choice-of-law rules, which "treat statutes of limitations as procedural, and therefore ordinarily mandate application of the District's own statute of limitations." *Jones v. Kirchner*, 835 F.3d 74, 81 (D.C. Cir. 2016) (alteration and internal quotation marks omitted). Under D.C. law, Plaintiffs' false imprisonment claim is time-barred. But even if it were timely, Plaintiffs fail to state a claim under both Texas and D.C. law.

The limitations period for false imprisonment is one year. D.C. Code Ann. § 12-301(4). That period runs "from the time the right to maintain the action accrues." *Id.* § 12-301. Although the D.C. Code does not define "accrues," the D.C. Court of Appeals has explained that "[w]here the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc). Any confinement attributable to GlobalX occurred, if at all, aboard its

aircraft on March 15–16, 2025, and ended when Plaintiffs disembarked. The Complaint was filed on July 17, 2026, more than one year later. The claim is therefore time-barred. Plaintiffs cannot extend accrual by pointing to their later detention in El Salvador, which was imposed by a foreign sovereign and in which GlobalX played no part.

Plaintiffs also fail to state a claim. Under Texas law, the elements of false imprisonment are "(1) willful detention; (2) without consent; and (3) without authority of law." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). Similarly, under D.C. law, a plaintiff must establish "(1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint." *Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147, 150 (D.C. 1979).

Here, GlobalX did not detain Plaintiffs. At all times, Plaintiffs were in the custody of the federal government or the government of El Salvador, not GlobalX; ICE officers were responsible for the custody of all passengers. PWS § 7.1. Nor does the Complaint allege that GlobalX used any "actual force or a threat of force" of the kind necessary for "[a]n unlawful deprivation of freedom." *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978). The PWS confirms the point: it provides that "[t]he guard crew shall not carry weapons." PWS § 7.1.

Plaintiffs may argue that the aircraft cabin itself supplied the "boundaries" of their confinement. But the boundaries must be "fixed by the defendant," *Faniel*, 404 A.2d at 150, and the Government—not the carrier—decided who was confined, where, and for how long.

To the extent Plaintiffs' confinement occurred aboard GlobalX aircraft, it was under the legal authority of ICE. "If a person detains another with the authority of law, he cannot be liable in tort for the reasonable exercise of that authority." *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C. 1996). GlobalX had no independent authority over who boarded, where the aircraft flew, or

when Plaintiffs were released. Those decisions belonged to the Government, and the Complaint does not allege that GlobalX exceeded any lawful authority delegated to it.

**2. Plaintiffs Do Not Allege Intentional Infliction of Emotional Distress**

To establish intentional infliction of emotional distress under D.C. or Texas law, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010); *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006) (listing the same elements). Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Williams*, 9 A.3d at 494 (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)); *Kroger*, 216 S.W.3d at 796 ("Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous.").

The Complaint does not allege extreme or outrageous conduct by GlobalX. Its allegations of mistreatment describe conduct by government officials and Salvadoran prison authorities—not GlobalX. GlobalX provided air-charter services as its contract required. Operating charter flights pursuant to a government contract is not conduct "beyond all possible bounds of decency," much less conduct intended or recklessly likely to cause severe emotional distress. The lone allegation that "some GlobalX staff mocked Class Members," Compl. ¶ 122, does not change the analysis: liability for this tort "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d (1965); *Kroger*, 216 S.W.3d at 796.

**3. Plaintiffs Do Not Allege Negligence**

Under D.C. law and Texas law, a negligence claim requires "(1) a duty, (2) breach, and (3) injury proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (en banc); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). Plaintiffs' negligence claim fails because GlobalX owed no duty to Plaintiffs independent of its contractual obligations to CSI and, through CSI, to ICE. *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010) ("Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence." (citation omitted)). No liability exists "where the negligence of the actor consists in a failure to act for the protection or assistance of another." *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971, 978 (D.C. 2023). That is because there is no general duty in tort law "to control the conduct of a third person as to prevent him from causing physical harm to another." *Hoehn v. United States*, 217 F. Supp. 2d 39, 45–46 (D.D.C. 2002) (quoting Restatement (Second) of Torts § 315 (1965)); *see also Carter v. Abbyad*, 299 S.W.3d 892, 895 (Tex. App.—Austin 2009, pet. denied) ("Texas law generally imposes no duty to control the acts of another person to prevent harm to third parties absent certain special relationships or circumstances." (citation omitted)).

The same is true here. GlobalX owed no duty to protect Plaintiffs from the consequences of the Government's removal decisions because it had no control over whether, where, or why they were removed. Nor did GlobalX owe Plaintiffs any duty to protect them against the treatment they allegedly endured in El Salvador. And no special relationship or other circumstance exists that would take this situation out of the general rule.

Still, Plaintiffs insist that GlobalX owed them a duty "to avoid exposing them to an unreasonable risk of physical or psychological harm" and "to refrain from participating in transfers that would foreseeably result in torture, cruel, inhuman, or degrading treatment, arbitrary detention, or other serious abuses." Compl. ¶ 236. But to impose a duty to protect against the

intervening criminal acts of a third party, a plaintiff must do more than allege that the criminal acts were foreseeable. D.C. courts require "heightened foreseeability," supported by "alleg[ations] commensurate with the extraordinary nature of intervening criminal conduct." *Bd. of Trs. of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 871 (D.C. 2009) (cleaned up). It is not enough that the criminal act was "possible to foresee"; there must have been "a reasonable probability—and thereby constructive notice—that the intervening act [would] occur." *Id.* at 875. Plaintiffs fail to plead heightened foreseeability.

The heightened-foreseeability standard typically requires a special relationship and a pattern of similar prior criminal conduct known to the defendant. Plaintiffs allege neither. They do not allege that GlobalX had any relationship with Plaintiffs beyond carrying them as passengers in ICE custody, that GlobalX had any role in or knowledge of conditions at CECOT, or that GlobalX had notice of prior abuses by Salvadoran authorities against deportees it had carried. The Complaint's allegations about CECOT concern the decisions and conduct of the United States and El Salvador governments. Compl. ¶¶ 40–46. Generalized public reporting about a foreign prison cannot supply the specific, constructive notice D.C. law demands—particularly where the defendant had no authority to decide who was removed or where. Holding otherwise would make every carrier, driver, or vendor that supports a lawful government operation an insurer against the later acts of foreign sovereigns.

GlobalX also had no duty to interfere with, or refuse to perform, the directives of the federal Government. The *J.G.G.* proceedings were directed at the Government, not GlobalX, and the Government's own filings in those proceedings describe the United States—not private flight contractors—as making the removal and detention decisions. *See, e.g.*, Defs.' Resp. to Ct. Order at 1–4, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Nov. 25, 2025), ECF No. 195 (identifying

the decisionmakers during the March 15 and 16 events, all of whom were government officials). Nothing in those proceedings supplies a basis for imposing on GlobalX an independent duty to override the Government's directions—a duty that, if it existed, would require a private carrier to second-guess federal officials in real time at the risk of criminal liability for impeding them. *See* 18 U.S.C. § 111.

The claim also fails for lack of proximate cause. Any alleged harm was caused by the independent, intervening acts of government officials—including the decision to remove Plaintiffs, the selection of their destination, and their treatment after removal—and of the government of El Salvador. Those independent decisions by sovereign actors are superseding causes that break any chain of causation between GlobalX's operation of flights and Plaintiffs' alleged injuries.[9]

**4. Plaintiffs Do Not Allege Negligent Infliction of Emotional Distress**

First, under Texas law, there is no recognized claim for negligent infliction of emotional distress. *See Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex. 1993). Second, even under D.C. law, Plaintiffs' claim would fail. D.C. law imposes liability for negligent infliction of emotional distress only in limited circumstances. *See Hedgepeth*, 22 A.3d at 796. Specifically, a plaintiff may recover if she was in "the zone of danger." *Id.* That is, the defendant's negligent conduct "places the other in immediate danger of bodily harm and the emotional disturbance results from the danger . . . ." *Id*. at 800 (citation omitted). Otherwise—as here, where Plaintiffs do not allege that they were in the zone of danger—a plaintiff may recover only "by show[ing] that (1) the defendant has a relationship with the plaintiff[s], or has undertaken an obligation to the plaintiff, of a nature that

[9] To the extent Plaintiffs allege that the conduct of third parties was foreseeable, that allegation is a legal conclusion that fails under both the ordinary and the heightened foreseeability standards discussed above.

necessarily implicates the plaintiff's emotional well-being; (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff;" and "(3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Blackwell v. Planet Fitness Franchising, LLC*, 356 A.3d 1251, 1260 (D.C. 2026) (internal quotation marks and citations omitted).

Plaintiffs' claim fails for several reasons. First, as explained above, GlobalX owed no duty to Plaintiffs, and none of GlobalX's actions proximately caused harm to Plaintiffs. Second, Plaintiffs do not allege that GlobalX's actions put Plaintiffs at risk of immediate harm (i.e., the zone-of-danger theory). Third, Plaintiffs do not allege any special relationship, let alone a qualifying one, that would permit a claim outside the zone-of-danger theory. Indeed, pilots, flight attendants, and other flight staff do not have a relationship with the detainees they transport "of a nature that necessarily implicates the plaintiff's emotional well-being." *See Hedgepeth*, 22 A.3d at 801–08 (analyzing cases and explaining that the requisite relationship exists for those responsible for a person's emotional well-being, such as therapists, funeral home employees, and doctors delivering a cancer diagnosis, but not for lawyers, podiatrists, or restaurant owners).

## IV. Plaintiffs' State-Law Claims Are Preempted by Federal Law

Even if Plaintiffs' state-law claims were plausibly alleged (they are not), the claims are independently preempted under *Boyle* and by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1).

### A. Plaintiffs' Claims Against CSI Are Preempted Under *Boyle*, and By Extension Must Fail Against GlobalX

As Defendant CSI explains in more depth in its Motion to Dismiss, Plaintiffs' state-law tort claims against CSI are preempted by federal law under *Boyle*, 487 U.S. at 511–12. CSI's contract to provide aviation services to the federal government in the implementation of its

immigration policy implicates a core federal interest, and Plaintiffs' state tort claims would conflict with that interest. *See United States v. Texas*, 97 F.4th 268, 288 (5th Cir. 2024) ("Congress has legislated so comprehensively in the field of noncitizen entry, reentry, and removal that it left no room for supplementary state legislation." (internal quotation marks and citation omitted)); *GEO Grp., Inc. v. Newsom*, 50 F.4th at 758 (holding that state law banning private immigration-detention centers is preempted as violating a "foundational limit on state power").

And the state-law claims here meet each of the *Boyle* requirements—that (1) the federal government approved "reasonably precise" procedures; (2) the contractor "conformed" to those procedures; and (3) the federal government was on notice of any dangers that might arise due to the procedures. *Boyle*, 487 U.S. at 512. Here, the federal government gave "reasonably precise" procedures and direction to CSI in the PWS. Specifically, it hired CSI to provide "charter aircraft services, flight crews, medical crew, and security crews as described" throughout the PWS. *See* PWS § 1.0; Compl. ¶¶ 7, 65, 74–75, 77–79. Plaintiffs allege the Government dictated the passenger manifest, the times and destinations, and all other material details. *See* Compl. ¶¶ 18, 74–75, 81, 167; PWS § 8.7. Finally, the Complaint does not allege any danger known to CSI but unknown to the Government. To the contrary, any purported dangers associated with the removals arose from the Government's own decisions, as it chose individuals for removal, selected the departure and arrival destinations, and dictated flight times. And the Government, not CSI, was party to the *J.G.G.* litigation. *See* Compl. ¶¶ 94–112. Accordingly, *Boyle* forecloses Plaintiffs' state-law claims against CSI.

In turn, Plaintiffs' claims against GlobalX are also preempted. Plaintiffs allege that "[a]t all relevant times, GlobalX acted as an agent for CSI" and that its "work flowed through, and existed only by virtue of, CSI's prime contract with ICE." Compl. ¶ 18. Particularly in that

situation, federal law must also preempt claims against a subcontractor. *See Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 71–72 (3d Cir. 1990) (applying government contractor defense to subcontractor on basis of prime contractor's interaction with government); *accord LaForge v. ECC Operating Servs.*, No. CIV.A 07-523, 2010 WL 497657, at *1–2 (E.D. La. Feb. 5, 2010) (same and listing cases); *Griffin v. JTSI, Inc.*, No. CIV. 08-00242 ACK, 2009 WL 8761211, at *12 n.35 (D. Haw. July 28, 2009).

### B. The Airline Deregulation Act Independently Preempts Plaintiffs' State-Law Claims

The ADA provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1); *see also* 49 U.S.C § 40102(2) (defining "air carrier" broadly as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–86 (1992) (holding that the statutory text "express[es] a broad pre-emptive purpose," and rejecting the argument that the ADA preempts "only state laws specifically addressed to the airline industry"). GlobalX is an FAA-certified "air carrier" that provided "air transportation" services to CSI and, in turn, the federal government. Compl. ¶ 20; 49 U.S.C § 40102(2), (5). Plaintiffs' state-law claims fall within the statutory text because they seek to impose liability related to the air transportation service that GlobalX provided to the federal government.

The phrase "related to" is "much more broadly worded" than other preemption provisions. *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014); *see also, e.g.*, *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (rejecting implied exception to ADA for state "public health" objective). Plaintiffs' tort claims seek to penalize GlobalX for providing air transportation on the routes and under the schedules it was directed to use—the very routes and

services that define its operations. Imposing tort liability on an air carrier for the routes it flies and the passengers it carries would have a significant effect on air-carrier practices and therefore falls within the ADA's preemptive scope. *See Del Rio v. CrowdStrike, Inc.*, 787 F. Supp. 3d 768, 772–75 (W.D. Tex. 2025) (finding state tort claims preempted where they would have significant effects on airline services and practices), *aff'd*, No. 25-50518, 2026 WL 1416528 (5th Cir. May 20, 2026).

Plaintiffs may argue that their claims concern not GlobalX's "air service" but its participation in a government program. That framing would only confirm preemption. The conduct Plaintiffs challenge is GlobalX's transport of passengers in government custody on a particular route to a particular destination, which is the core of an air carrier's service. And there is no limitation on preemption based on the type of service (*i.e.*, charter, commercial airlines, etc.)—just that it involves an "air carrier" providing "air transportation", both of which definitions GlobalX falls squarely within. 49 U.S.C. § 41713(b)(1); 49 U.S.C § 40102(2), (5).

## CONCLUSION

For these reasons, the Court should dismiss all claims against GlobalX for lack of personal jurisdiction and improper venue or, in the alternative, because the claims are barred by *Yearsley*, preempted under *Boyle* and the Airline Deregulation Act, and otherwise fail to state a claim. Because Plaintiffs' claims against GlobalX fail as a matter of law in any forum, dismissal is warranted.

Dated: November 12, 2026

*/s/ Mark Pinkert*

Mark Pinkert*
Lindsey Lazopoulos Friedman*
Steven LaRussa*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2333 Ponce De Leon Blvd., Suite 600
Miami, FL 33134
(305) 379-1601
mpinkert@holtzmanvogel.com
**pro hac vice*

Kellen Dwyer (D.C. Bar No. 1008151)
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
(202) 737-8808
kdwyer@holtzmanvogel.com

*Counsel for Global Crossing Airlines Group Inc. and Global Crossing Airlines, Inc., d/b/a GlobalX*